UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MELONIE BRATCHER,

     Plaintiff,

                                       CASE NO.: 3:16-cv-00519-HES-JBT

v.

NAVIENT SOLUTIONS, LLC,

     Defendant.

_____/

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

COMES NOW, the Plaintiff, Melonie Bratcher, by and through her undersigned counsel, respectfully requests partial summary judgment against the Defendant, Navient Solutions, LLC ("NSL"), pursuant to Federal Rule of Civil Procedure 56, and asserts the following:

### I.    INTRODUCTION

"I'm already taking care of my student loans and I'd just like for you guys to stop calling me…So I don't want you guys calling me again. Thank you very much." Ms. Bratcher then immediately hung up the phone. This is what Ms. Bratcher told Defendant during a recorded conversation on March 14, 2016—the 189th robocall Defendant made to Ms. Bratcher. Four days later, on March 18, 2016, Ms. Bratcher answered the 206th robocall to her cellular telephone and again asked for the calls to stop, stating, "I asked you guys not to call me anymore. I'm getting an attorney and I'm going to sue you guys now. Have a good day. Don't call me again." She then hung up the phone. These are crystal clear "revocations of consent" under the law, yet Defendant ignored Ms. Bratcher's repeated pleas for the calls to stop, and proceeded to robocall Ms. Bratcher

74 (seventy-four) times after the recorded conversation on March 14, 2016, and another 57 (fifty-seven) times following the conversation on March 18, 2016.

Over a span of mere months, the Defendant repeatedly harassed Ms. Bratcher regarding her student loans using an automatic telephone dialing system ("ATDS"), commonly referred to as "robocalls" or "robo-blasting." Unfortunately, this misconduct is nothing new to the Defendant; the Defendant's robo-bullying was recently taken to task in the Middle District of Florida, where the Honorable Judge Virginia Covington granted partial summary judgment in favor of the plaintiff for $363,500 after the plaintiff received 727 robocalls without her prior express consent. *See McCaskill v. Navient Sols., Inc.*, 178 F. Supp. 3d 1281, 1287 (M.D. Fla. 2016). However, this Defendant continues to break the law in this manner, and regularly gets away with it. In fact, the Defendant is currently facing yet *another* motion for partial summary judgment in the Southern District of Florida on nearly identical violations of the law to those at issue in this case. *See Cedeno v. Navient Solutions, LLC*, No. 0:16-cv-61049, Dkt. 51 (S.D. Fla. Dec. 16, 2016). In *Cedeno*, this Defendant robocalled plaintiff 525 times after he told Defendant "I don't want anyone to call me at this number," and another 521 times after being told, "I'm making payments…Don't call me anymore. If you call me anymore, I'm going to report that you're harassing me." *Id.* at 1. The eerily similar facts between the *Cedeno* matter and today's case demonstrate the Defendant's systematic and institutional decision to regularly ignore the law by refusing to honor consumers' requests for calls to stop. Unfortunately for American consumers, this type of lawless robo-bullying is no mistake, but rather an intentional business model used by the Defendant.

Ms. Bratcher, like millions of other Americans aspiring to further their education, took out student loans to earn a college degree. Despite making payments periodically to the best of her ability, these robocalls from the Defendant would constantly and consistently come two, three,

even four times per day over three to four consecutive days at a time, with no end in sight. This case is ultimately about the Defendant's willful and/or knowing violations of the law in the face of Ms. Bratcher repeatedly begging for the calls to stop.

With no way to make the harassment end, Ms. Bratcher filed her Complaint [Doc. 1] on April 28, 2016 for violations of Telephone Consumer Protection Act ("TCPA"), Fair Debt Collection Practices Act ("FDCPA"), and Florida Consumer Collections Practices Act ("FCCPA"). By enacting the TCPA, Congress intended to "protect individual consumers from receiving intrusive and unwanted telephone calls." *Mims v. Arrow Fin. Servs., LLC*, —US—, 132 S.Ct. 740, 745, 181 L.Ed. 2d 881 (2012).

The TCPA is a remedial statute that was passed to protect consumers from unwanted automated telephone calls. *Gager v. Dell Financial Services, LLC*, 727 F.3d 265 (3d Cir. 2013); *see also*, S. Rep. 102–178, at 5 (1991), reprinted in 1991 U.S.C.C.A.N. 1968, 1972; *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009) (discussing TCPA's purpose of curbing calls that are a nuisance and an invasion of privacy); *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Soundbite Communications, Inc.*, 27 FCC Rcd. at 15391–92 ¶ 2 (Nov. 26, 2012) (discussing TCPA's purpose of protecting consumers against unwanted contact from automated dialing systems). Because the TCPA is a remedial statute, it should be construed to benefit consumers. *See Lesher v. Law Offices of Mitchell N. Kay, PC*, 650 F.3d 993, 997 (3d Cir. 2011).

For the reasons comprehensively set forth below, the Plaintiff is entitled to judgment as a matter of law for violations of the TCPA, including treble damages for Defendant's willful or knowing violations of the TCPA.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Ms. Bratcher was a resident of Palatka, Florida at all times material to this lawsuit, August 5, 2014 to April 28, 2016. (Ex. A, Bratcher Dep., 42:3–16).

2.      At all times material to this lawsuit, Ms. Bratcher was the sole subscriber to and user of the cellular telephone assigned the telephone number (***) ***-3534, hereinafter referred to as the "3534" telephone number. (Ex. A, Bratcher Dep., 48:17–24).

3.      The Defendant made 263 robocalls between August 5, 2014 and May 6, 2016. (Ex. B "NSL Call Log," NSI0000084-000001–000005; *see also* Ex. C, "Plaintiff's Cellular Telephone Records"; Ex. D, Dillon Dep. 95:21-24).

4.      The Defendant called Ms. Bratcher nearly every day, with up to five robocalls per day. (Ex. B, "NSL Call Log" NSI0000084-000001–000005; *see also*, Ex. C, "Plaintiff's Cellular Telephone Records").

5.      It is Defendant's policy to robocall an individual an astounding eight times in a single day. (Ex. D, Dillon Dep., 110:4–10).

6.      All 263 robocalls were made using an ATDS. (NSL Answer [Doc. 8] at ¶ 21–24, 26).

7.      Defendant's robocalls to Ms. Bratcher were for the purpose of collecting an alleged consumer debt. (Ex. D, Dillon Dep., 15:4–12).

8.      Defendant's debt collection agents receive incentives and bonuses based on "resolving past due accounts," which includes collecting money from customers. (Ex. D, Dillon Dep., 14:24–15:12).

9.      On March 14, 2016, Ms. Bratcher answered a robocall on which a debt collection agent of the Defendant located someplace offshore, outside of the United States, possibly in the

Philippines, was on the other end. (Ex. D, Dillon Dep., 80:19–81:6). During the resultant conversation, Ms. Bratcher informed the Defendant "I'm already taking care of my student loans. And I'd just like for you guys to stop calling me…So I don't want you guys calling me again. Thank you very much." (Ex. E, Audio Recording, dated March 14, 2016, NSL 0000075).

10.     Just four days later, on March 18, 2016, Ms. Bratcher answered another robocall from the Defendant, this time speaking with another collection agent of the Defendant located someplace offshore outside of the United States, possibly in the Philippines. (Ex. D, Dillon Dep., 80:19–81:6). During this call, Ms. Bratcher stated that "I asked you guys not to call me anymore. I'm getting an attorney and I'm going to sue you guys now. Have a good day. Don't call me again." (Ex. F, Audio Recording, dated March 18, 2016, NSL 0000078).

11.     Defendant's corporate representative testified that the recorded conversations between Ms. Bratcher and Defendant on March 14, 2016 and March 18, 2016 would be considered a revocation of consent. (Ex. D, Dillon Dep., 83:3–15).

12.     Defendant has a policy and procedure dedicated to "TCPA Consent Removal Requests – Key Phrases" that provides Defendant's debt collection agents "a table of key phrases that will help identify scenarios where TCPA consent must be removed." (Ex. G, "Customer Resolution Services, TCPA Job Aid," NSL0000104-NSI0000117).

13.     According to both Defendant's corporate representative, as well as Defendant's policy and procedures, "stop calling me" is a key phrase where TCPA consent *must* be removed. (Ex. G, "Customer Resolution Services, TCPA Job Aid," NSL0000104-NSI0000117).

14.     According to Defendant's policy and procedures, "do not call" is a key phrase where TCPA consent *must* be removed. (Ex. G, "Customer Resolution Services, TCPA Job Aid," NSL0000104-NSI0000117).

15.     According to Defendant's policy and procedures, "where the customer hangs up abruptly…you need to take extra precaution and remember to update TCPA permissions to 'No.'" (Ex. G, "Customer Resolution Services, TCPA Job Aid," NSL0000104-NSI0000117).

16.     The Senior Director of Defendant's Office of Customer Advocate, Angela Kamionka, testified that the requests and complaints made by Ms. Bratcher during the recorded conversations should have been notated on Ms. Bratcher's account and escalated to her office. (Ex. H, Kamionka Dep., 79: 15–25).

17.     Of the Defendant's 263 calls, seventy-four occurred after Ms. Bratcher's conversation with one of the Defendant's offshore collection agents on March 14, 2016. (Ex. B "NSL Call Log" NSI0000084-000001–000005; *see also*, Ex. C, "Plaintiff's Cellular Telephone Records").

18.     Of the Defendant's 263 calls, fifty-seven occurred after Ms. Bratcher's conversation with one of the Defendant's offshore collection agents on March 18, 2016. (Ex. B, "NSL Call Log" NSI0000084-000001–000005; *see also*, Ex. C, "Plaintiff's Cellular Telephone Records").

19.     Each and every one of the 263 calls harmed Ms. Bratcher by wasting her time, depleting battery life on her cellular telephone, and invading her privacy, as well as her time at work and with family, friends, and loved ones. (Ex. A, Bratcher Dep., 51:5–53:1; 110:16–111:6; 113:1–2).

20.     Each and every one of the 263 calls was harassing, oppressive, and at times abusive, causing stress and frustration for Ms. Bratcher. (Ex. A, Bratcher Dep., 51:5–53:1; 110:16–111:6; 113:1–2; Ex. E, Audio Recording, dated March 14, 2016, NSL 0000075; Ex. F, Audio Recording, dated March 18, 2016, NSL 0000078).

21.     Each and every robocall placed to Ms. Bratcher after March 14, 2016 and March 18, 2016 was intentionally made with the Defendant's actual knowledge of the Plaintiff's revocations of consent, which were documented during the recorded conversations that took place on March 14, 2016 and March 18, 2016. (Ex. D, Dillon Dep., 108:6–109:10).

22.     None of the calls were made for emergency purposes. (NSL Answer [Doc. 8] at ¶ 42).

### III.    LEGAL STANDARD

Rule 56(c) mandates the granting of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party bears the initial burden of "informing the Court of the basis of its motion," and identifying those portions of the record "which it believes demonstrates the absence of any genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-moving party must "go beyond the pleadings" and designate facts in the record, "showing that there is a genuine issue for trial." *Id*. at 324.

In responding to a motion for summary judgment, the non-moving party "may not rest upon mere allegations or denials," but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party must also do more than simply show that there exists some doubt as to the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*,

85 F.3d 1002, 1011 (2d Cir. 1996). Moreover, the non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)), or "some metaphysical doubt as to the material facts." *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita*, 475 U.S. at 586–87). Furthermore, the non-movant cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). Under these standards, the undisputed facts of this case compel the conclusion that Plaintiff is entitled to summary judgment with regards to Plaintiff's TCPA claims.

## IV.   LEGAL ARGUMENT AND CITATION OF AUTHORITY

The facts in the record unequivocally demonstrate that Defendant called Plaintiff 263 times on her cellular telephone, using an ATDS, in the attempt to collect a debt. (Ex. B, "NSL Call Log" NSI0000084-000001–000005; *see also*, Ex. C, "Plaintiff's Cellular Telephone Records"). After conversations with the Defendant on March 14, 2016 and March 18, 2016, in which Ms. Bratcher clearly and concisely revoked any prior express consent to receive such calls, Defendant robodialed Ms. Bratcher seventy-four times, and fifty-seven times, respectively, in stark violation of the TCPA.

### A.   The Plaintiff is Entitled to Judgment as a Matter of Law Regarding the Seventy-Four Robocalls, or Alternatively, the Fifty-Seven Robocalls, That Were Made After the March 14, 2016 and March 18, 2016 Revocations of Consent.

The first matter that the Plaintiff seeks summary judgment on is the liability of the Defendant for the base TCPA statutory damages of $500.00 per call for the seventy-four calls made to Ms. Bratcher's cellular telephone after the March 14, 2016 conversation, or in the

alternative, for the fifty-seven calls after the March 18, 2016 conversation, both of which constitute

a revocation of prior express consent. The relevant provisions of the TCPA provide that:

(b) Restrictions on the Use of Automated Telephone Equipment

(1) Prohibitions **It shall be unlawful for any person** within the United States, or
any person outside the United States if the recipient is within the United States—

> (A)  **to make any call** (other than a call made for emergency purposes or
> made with the **prior express consent of the called party**) using any
> **automatic telephone dialing system** or an artificial or prerecorded voice—

. . .

> (iii)  to any telephone number assigned to a paging service,
> **cellular telephone** service, specialized mobile radio service, or
> other radio common carrier service, or any service for which the
> called party is charged for the call…

47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). As will be shown below, all requirements of this

statute have been demonstrated by evidence, and no genuine issues of material fact remain.

### i.  <u>All Requirements of the TCPA Have Been Satisfied.</u>

#### a.  United States Connection of the Case.

As a preliminary matter, there is no dispute that the calls in question have the requisite

United States connection required by the TCPA, as the calls were made to a "recipient . . . within

the United States," using a United States-based cellular number, with a Putnam County, Florida

904 area code. Ms. Bratcher also testified that she was a resident of Palatka, Florida, and had

resided at that address for approximately three years. (Ex. A, Bratcher Dep., 42:3–16).

#### b.  Use of an ATDS or Prerecorded Voice to Make Calls to a Cell Phone.

The Defendant does not dispute that an ATDS was used to place all 263 phone calls to Ms.

Bratcher's cellular telephone, including the seventy-four calls made after the March 14, 2016, and

the fifty-seven calls after the March 18, 2016 conversations in which Ms. Bratcher revoked any

prior express consent to receive calls from Defendant. (Ex. B, "NSL Call Log" NSI0000084-000001–000005; *see also*, Ex. C, "Plaintiff's Cellular Telephone Records").

### c. Defendant's Calls Were Not Made For "Emergency Purposes."

The Defendant does not contest that all 263 phone calls to Ms. Bratcher's cellular telephone were made for non-emergency purposes. (NSL Answer [Doc. 8] at ¶ 42).

### d. The Plaintiff is the Called Party.

Plaintiff is the "called party." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961 ¶ 73 (2015) ("2015 FCC Order") ([...]the "called party" is the subscriber, *i.e.*, the consumer assigned the telephone number dialed and billed for the call, or the non-subscriber customary user of a telephone number included in a family or business calling plan). *See also Breslow v. Wells Fargo Bank, N.A.*, 755 F.3d 1265 (11th Cir. 2014); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014). Specifically, Ms. Bratcher has testified that, at all times material to this lawsuit, Ms. Bratcher was the sole subscriber to and user of the cellular telephone assigned the "3534" telephone number. (Ex. A, Bratcher Dep., 48:17–24).

### ii. Any "Prior Express Consent" Was Clearly Revoked by the Plaintiff During Conversations on June 18, 2015 and June 22, 2015.

The issue of a consumer's right to revoke any prior express consent was comprehensively addressed by the FCC in its 2015 FCC Order, in which the FCC, in a section aptly titled "Revoking Consent" stated,

> **Consumers have a right to revoke consent, using any reasonable method including orally** or in writing. Consumers generally may revoke, for example, by way of a consumer-initiated call, **directly in response to a call initiated or made by a caller**, or at an in-store bill payment location, among other possibilities. We find that in these situations, callers typically will not find it overly burdensome to implement mechanisms to record and effectuate a consumer's request to revoke her

> or her consent. We conclude that **callers may not abridge a consumer's right to revoke consent using any reasonable method.**

2015 FCC Order at ¶ 64 (emphasis added). District courts may not determine the validity of FCC orders, including by refusing to enforce an FCC interpretation, because "[d]eeming agency action invalid or ineffective is precisely the sort of review the Hobbs Act delegates to the courts of appeals in cases challenging final FCC orders." *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1307 (11th Cir. 2015) (*citing Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1120–21 (11th Cir. 2014)). *See also Self v. Bellsouth Mobility, Inc.*, 700 F.3d 453, 461 (11th Cir. 2012). If the Hobbs Act applies, a district court must afford FCC final orders deference, and may only consider whether the alleged action violates FCC rules or regulations. *Id.* at 1307. FCC orders "'adopted by the Commission in the avowed exercise of its rule-making power' that 'affect or determine rights generally…have the force of law and are orders reviewable under the' Hobbs Act." *Id.* It is also well established by precedent binding upon this Court that the subscriber or user of a cellular telephone may *orally* revoke any previous-given consent to use of an ATDS to contact that cellular telephone. *See Osorio*, 746 F.3d at 1255 (holding that consent under the TCPA may be revoked orally). In this case, there were not only one, but **two independently sufficient revocations of consent.** Notwithstanding these revocations, the Defendant continued to unlawfully robocall Ms. Bratcher seventy-four times after the first such revocation, and fifty-seven times after the second revocation.

The first revocation occurred during a conversation on March 14, 2016. After Defendant's representative introduced himself and Ms. Bratcher confirmed her identity, the following exchange occurred:

> **MS. BRATCHER**: Okay. I'm going to stop you right now. I'm already taking care of my student loans. And I'd just like for you guys to stop calling me.

> **ROMEO ATIENZA**: I see. How did you take care of that one, ma'am?
>
> **MS. BRATCHER**: Because I've already made arrangements with the Department of Education.
>
> **ROMEO ATIENZA**: I see. I understand that, Ms. Bratcher, but I'm not representing the Department of Education.
>
> **MS. BRATCHER**: I know you're not. You're representing Navient, which is also being sued. So I don't want you guys calling me again. Thank you very much.

(Ex. E, Audio Recording, dated March 14, 2016, NSL 0000075). As can be heard on the audio recording, the representative clearly identified Ms. Bratcher as the account holder, and Ms. Bratcher clearly revoked consent twice within this single conversation, first by stating that "I'd just like for you guys to stop calling me," and again stating "So I don't want you guys calling me again." Yet Ms. Bratcher found herself once again pleading for the calls to stop during a conversation a mere four days later. As the Defendant simply disregarded Ms. Bratcher's first request for the calls to stop, the March 18, 2016 conversation constituting Ms. Bratcher's second revocation was equally explicit in the demand for the calls to cease. The following is a full transcript of the call:

> **NEDIE CAMILLER**: Hello, Melonie? Melonie Bratcher?
>
> **MS. BRATCHER**: Yes.
>
> **NEDIE CAMILLER**: Hi, this is [NEDIE] from Navient.
>
> **MS. BRATCHER**: Yes. I asked you guys not to call me any more. I'm getting an attorney and I'm going to sue you guys now. Have a good day. Don't call me again.

(Ex. F, Audio Recording, dated March 18, 2016, NSL 0000078).

As can be seen from the above, there was absolutely no room for any misunderstanding of Ms. Bratcher's desire for the calls to stop. Moreover, as one listens to the audio recording, Ms. Bratcher's frustration, desperation, and helplessness is palpable. As explained by the FCC, "the

TCPA requires only that the called party clearly express his or her desire not to receive further calls." 2015 FCC Order at ¶ 67. That test is more than amply met in this case.

In fact, after listening to the two audio recordings in this case, Defendant's own corporate representative agreed that both of those conversations would be considered a revocation of consent "if we knew it to be the customer." (Ex. D, Dillon Dep., 83:3–15). Of course, Defendant conveniently dismissed the fact that Ms. Bratcher clearly confirmed her identity during both recorded conversations on March 14, 2016 and March 18, 2016 by responding "Yes," when she was asked if this was Ms. Bratcher. The Defendant knew it was Ms. Bratcher. Moreover, Defendant's own policies and procedures have a section titled "TCPA Consent Removal Requests – Key Phrases," which identifies key phrases that "will help identify scenarios where TCPA consent must be removed" from a customer's account to stop unwanted robocalls and ensure compliance with the TCPA. (Ex. G, "Customer Resolution Services, TCPA Job Aid," NSL0000104-NSI0000117). One of the key phrases requiring removal of consent is "stop calling me." (Ex. G, "Customer Resolution Services, TCPA Job Aid," NSL0000104-NSI0000117). Defendant's corporate representative agreed that Ms. Bratcher can be clearly heard using the phrase "stop calling me" during the March 14, 2016 recording. (Ex. D, Dillon Dep., 75:9–12). Defendant also agreed that TCPA consent must be removed from the account when a key phrase, such as "stop calling me," is used by a customer. (Ex. D, Dillon Dep., 76:7–21). Defendant's corporate representative further testified that "If we know that it's our customer we adhere to this table of phrases that would indicate removal of consent." (Ex. D, Dillon Dep., 76:19-21).

In response to the March 18, 2016 recorded conversation during which Ms. Bratcher stated "I asked you guys not to call me anymore. I'm getting an attorney and I'm going to sue you guys now. Have a good day. Don't call me again," and then abruptly hung up on the debt collector,

Defendant's corporate representative testified that "…if a customer did that, that would be true [would be considered a revocation of consent] if we knew it to be the customer." (Ex. D, Dillon Dep., 83:3–15). The Senior Director of Defendant's Office of Customer Advocate, Angela Kamionka, testified that the requests and complaints made by Ms. Bratcher during the recorded conversations should have been notated on Ms. Bratcher's account and escalated to her office. (Ex. H, Kamionka Dep., 79: 15–25). Yet, Defendant never even removed TCPA consent from Ms. Bratcher's account following the March 14, 2016 conversation. Instead, Defendant robocalled Ms. Bratcher seventy-four times without her consent. (Ex. B, "NSL Call Log" NSI0000084-000001–000005; *see also*, Ex. C, "Plaintiff's Cellular Telephone Records"). Defendant never removed TCPA consent from Ms. Bratcher's account following the March 18, 2016 conversation. Instead, Defendant robocalled Ms. Bratcher fifty-seven times without her consent. (Ex. B, "NSL Call Log" NSI0000084-000001–000005; *see also*, Ex. C, "Plaintiff's Cellular Telephone Records"). Despite Defendant agreeing that the recorded conversations on March 14, 2016 and March 18, 2016 were revocations of consent, Defendant refused to honor those revocations because "The person that we spoke to on that date was not on the phone long enough for the verification process. So, we could not confirm or deny who it was." (Ex. D, Dillon Dep., 101:20–23).

In short, there is absolutely no legal grounds for Defendant's manufactured "verification" argument. Not only would Defendant's "verification" defense not be supported by case law, but there is also **binding** authority that **directly** opposes it. The pertinent FCC regulations state the following regarding attempts by callers to impose restrictions on methods of revocation:

> Consumers have a right to revoke consent, using any reasonable method including orally or in writing. Consumers generally may revoke, for example, by way of a consumer-initiated call, directly in response to a call initiated or made by a caller, or at an in-store bill payment location, among other possibilities. We find that in these situations, callers typically will not find it overly burdensome to implement mechanisms to record and effectuate a consumer's request to revoke his or her

consent. We conclude that callers may not abridge a consumer's right to revoke consent using ***any reasonable method***.

* * *

[T]he most reasonable interpretation of "prior express consent" in light of the TCPA's consumer protection goals is to permit a right of revocation. To then interpret the same term to allow callers to designate the exclusive means of revocation would, at least in some circumstances, materially impair that right. For example, if a caller receives a consumer's valid oral consent for certain messages but requires the consumer to fax his or her revocation to the caller, perhaps with additional conditions as to the content of such a revocation, such conditions materially diminish the consumer's ability to revoke by imposing additional burdens—especially if disclosure of such conditions is not clear and conspicuous, and not repeated to the consumer with each message.

Such a requirement would place a significant burden on the called party who no longer wishes to receive such calls, which is inconsistent with the TCPA. Rather, the TCPA requires only that the called party clearly express his or her desire not to receive further calls. This common-sense understanding of revocation is consistent with the Commission's requiring easy means of revocation and the notion that "any silence in the statute as to the right of revocation should be construed in favor of consumers," while acknowledging that where Congress has intended that the means of revocation be limited, it has said so clearly.

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7996–97 (2015) (emphasis added). Here, the Defendant's "verification" argument, in addition to being factually unsupported, would constitute exactly what the FCC has disapproved of, namely a barrier that "materially diminish[es] the consumer's ability to revoke by imposing additional burdens" with the additional problem of a lack of "clear and conspicuous . . . disclosure." As explained by the FCC excerpt above, Ms. Bratcher sufficiently exercised her legal right to revoke consent on March 14, 2016 and again on March 18, 2016, as "the TCPA requires only that the called party clearly express his or her desire not to receive further calls." The two audio recordings in this case leave no question that Ms. Bratcher *clearly* expressed such a desire.

For the foregoing reasons, the Plaintiff seeks summary judgment finding entitlement to $500.00 per call for the seventy-four calls made after the March 14, 2016 revocation, entitling Plaintiff to $37,00.00 in minimum statutory damages. In the unlikely event that this Court

determines that the March 14, 2016 revocation leaves a question of fact for determination by the jury, the Plaintiff would, in the alternative, request summary judgment as to the fifty-seven calls made after Plaintiff's second revocation on March 18, 2016, thus entitling Plaintiff to $28,500.00.

### B. The Plaintiff is Entitled to Judgment as a Matter of Law as to Defendant's Willful or Knowing Violations of the TCPA.

The second matter that the Plaintiff seeks summary judgment on is that the Defendant's seventy-four calls after Plaintiff's March 14, 2016 revocation, or alternatively, the fifty-seven calls to the Plaintiff's cellular telephone following the March 18, 2016 second revocation, were "willful or knowing" in nature, thus entitling the Plaintiff to treble damages, or $1,500.00 per call. *See* 47 U.S.C. § 227(b)(3)(C). Here, there is a plethora of evidence to support this proposition. As a threshold matter, Defendant cannot in good faith dispute that it called Ms. Bratcher's cellular telephone seventy-four times for non-emergency purposes using an ATDS after being told to stop calling on March 14, 2016, and fifty-seven times after being told again on March 18, 2016.

In addition to the "strict liability" damages afforded by the TCPA, the statute goes on to provide "[i]f the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than three times the amount available under subparagraph (B) of this paragraph." 47 U.S.C. § 227(b)(3)(C). Furthermore:

> The requirement of "willful[] or knowing[]" conduct requires the violator to know he was performing the conduct that violates the statute. Cf. *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011) ("The [Act] does not require any intent for liability except when awarding treble damages."). For example, to violate section 227(b)(1)(A)(i), a defendant must know that he is using an "automatic telephone dialing system" to place a "call," "without the called party's prior express consent." *Id.* § 227(b)(1)(A)(i).

*Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1107 (11th Cir. 2015). Notably, the violator must "know he was performing the conduct that violates the statute," but need not know

that her conduct was actually violating the TCPA. *Haysbert v. Navient Sols., Inc.*, No. CV 15-4144 PSG (EX), 2016 WL 890297, at *10 (C.D. Cal. Mar. 8, 2016) ("the statute requires a defendant to intend or know that it was performing each of the elements of a TCPA claim (i.e. that it was making a call, to a person who did not provide prior express consent, using an automated system).") (citing *Lary*, 780 F.3d at 1107).

At the onset, the Defendant has numerous other federal lawsuits pending against them alleging similar violations as stated in Ms. Bratcher's complaint [Doc. 1]. The Defendant has been sued in district court 528 times since January 13, 2014, yet continues to maintain a corporate policy of using an ATDS or a prerecorded or artificial voice message to collect debts from individuals, such as Ms. Bratcher, for its own financial gain.[1] The Defendant has also produced through discovery thousands of pages of prior lawsuits with nearly identical allegations to those found in Ms. Bratcher's complaint. Additionally, Defendant has had 326 complaints classified under "communications tactics" filed against it with the Consumer Financial Protections Bureau ("CFPB") since January 2015,[2] and more than 1,320 complaints related to "Billing/Collection Issues" reported to the Better Business Bureau in the last three years [Doc. 1, ¶¶ 42–43]. Furthermore, there are more than three thousand additional informal complaints over only the past two years from abused and harassed individuals who are unable to make the robocalls stop, as well as complaints filed by governmental agencies, private agencies, and state attorneys general, which the Defendant stores in its internal Customer Satisfaction Interface, or CSI database. (Ex. H, Kamionka Dep., 28:5–10). This demonstrates not only a reckless pattern of behavior, but also an

---

[1] When Plaintiff filed her Complaint [Doc. 1], the total number of lawsuits against Defendant was 284. Notably, in the nearly one year that this litigation has been pending, that number has almost doubled, reflecting Defendant's institutional practice of harassing consumers in violation of the law.

[2] Again, similarly to the increase in lawsuits discussed in *supra* n. 1, this number has nearly doubled during this litigation. Plaintiff's Complaint [Doc. 1] reflected 168 complaints filed with the CFPB; the present number of complaints for similar conduct has almost doubled.

**institutional refusal** to properly document revocations of consent in brazen violation of the TCPA. The Defendant is acutely aware that they are routinely being accused of violating the TCPA and, as a serial violator of the law, should therefore be intimately familiar with the provisions of the statute. Should Defendant be allowed to continue this type of conduct with no accountability or repercussions, there would be drastic consequences. This shameless and lawless activity is an indefensible violation of Americans' rights and entitles Plaintiff to treble damages against the Defendant for each of the seventy-four robocalls after Ms. Bratcher's revocation on March 14, 2016, or in the alternative, for each of the fifty-seven robocalls after her March 18, 2016 revocation.

Astoundingly, Defendant has ostensibly admitted that Ms. Bratcher's requests during the recorded conversations on March 14, 2016 and March 18, 2016 were revocations of consent based on its own policies and procedures, which are specifically designed to ensure TCPA compliance. Even more astounding, Defendant intentionally placed each and every robocall to Ms. Bratcher with the actual knowledge of Ms. Bratcher's revocations of consent during the recorded conversations that took place on March 14, 2016 and March 18, 2016. (Ex. D, Dillon Dep., 108:6–109:10). Despite the letter of the law and its own policies and procedures, as well as Defendant's recognition that Ms. Bratcher effectively revoked her consent under the law on March 14, 2016 and again on March 18, 2016, Defendant made the intentional decision to *ignore* those valid revocations of consent, and robocalled Ms. Bratcher seventy-four times and fifty-seven times, respectively. (Ex. D, Dillon Dep., 108:6–109:10). Each of those seventy-four, or fifty-seven, robocalls following Ms. Bratcher's revocations of consent are the epitome of willful or knowing violations of the TCPA. The facts of this case were the very type of robo-bullying contemplated by Congress and the FCC when creating, implementing, and interpreting the TCPA, including

18

violations that would entitle an individual to treble damages under the law. If, based on the record of evidence, the seventy-four or fifty-seven robocalls following Ms. Bratcher's revocations of consent are not found to be willful or knowing violations of the law, then Ms. Bratcher finds herself in abject fear of just how egregious and brazen Defendant's violations of the TCPA must be to rise to a level that would entitle an individual to treble damages. If such a high threshold of misconduct is made the new standard, it would result in allowing multimillion dollar corporations like the Defendant, armed with the knowledge that their practices violate the TCPA, to continue such conduct with impunity, the ultimate consequence being the merciless harassment and harm suffered by the American consumer, who will be left without any meaningful legal protection or recourse.

As previously discussed, consistent with its purpose of protecting consumers, courts have explained that "[t]he TCPA is essentially a strict liability statute." *Alea London Ltd.*, 638 F.3d at 776. For that reason, the Eleventh Circuit has observed that a "willful or knowing" violation requires more than a showing that the caller knew it was making a "call," as every "strict liability" TCPA violation would likely also satisfy that requirement, leaving "almost no room for violations that are *not* 'willful[ ] or knowing[ ].'" *Lary*, 780 F.3d at 1107. Therefore, *some* additional conduct on the part of the caller is required in order to distinguish "willful or knowing" violations from basic "strict liability" violations. However, the threshold for such additional conduct is not high. For instance, the standard "does not require any malicious or wanton conduct—although, the conduct in this case seems to suggest malice on the part of the Defendant—but rather is satisfied by merely 'knowing' conduct." *Alea*, 638 F.3d at 776.

Moreover, the United States Supreme Court has held that "where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a

standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007); *accord*, *Edeh v. Midland Credit Mgmt., Inc.*, 748 F. Supp. 2d 1030, 1044–46 (D. Minn. 2010), *aff'd*, 413 F. App'x 925 (8th Cir. 2011) (applying *Burr* "willfulness" analysis in TCPA action). The Court observed that "the general rule that a common law term in a statute comes with a common law meaning, absent anything pointing another way." *Id.* at 57–58 (citing *Beck v. Prupis*, 529 U.S. 494, 500–01 (2000)). The Court held that "while 'the term recklessness is not self-defining,' the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Burr*, 551 U.S. at 68 (quoting *Farmer v. Brennan*, 511 U.S. 825 (1994)). *See also Harris v. World Fin. Network Nat. Bank*, 867 F. Supp. 2d 888, 895 (E.D. Mich. 2012) (holding that "[d]efendant's violations of § 227(b)(1)(A) after [the plaintiff notified it that it was calling the wrong number] were willful, or made with a reckless disregard to [p]laintiff's rights.").

There is no reasonable or justifiable defense for Defendant's debt collectors' obvious willful disregard of Ms. Bratcher's revocation of consent. At best, Defendant's seventy-four robocalls after the March 14, 2016 revocation, or Defendant's fifty-seven robocalls after the March 18, 2016 revocation, were willful or made with a reckless disregard to Ms. Bratcher's rights under the TCPA. At worst, the Defendant had *actual knowledge* that its campaign of robocalls against Ms. Bratcher was in flagrant violation of the TCPA, due to Ms. Bratcher unequivocally revoking any prior express consent to be called on March 14, 2016, and again on March 18, 2016.

In both scenarios, a trebling of damages to a total of $1,500.00 per call for either the seventy-four calls at issue, or the fifty-seven calls, is appropriate. *See Gambon v. R & F Enterprises, Inc.*, No. 6:14-cv-403-Orl-18GJK, 2015 WL 64561, at *1 (M.D. Fla. Jan. 5, 2015) (granting trebled damages of $1,500.00 for each call after plaintiff requested for calls from

defendant to stop); *see also Coniglio v. Bank of Am., N.A.*, No. 8:14-CV-01628-EAK, 2014 WL 5366248, at *5 (M.D. Fla. Oct. 21, 2014) (vacated on other grounds) (noting that allegations of unambiguous communications requesting cessation of direct communication with a TCPA Claimant were adequate to establish that the TCPA defendant's conduct was knowing and willful, and therefore treble damages of $1,500.00 per call was appropriate); *Clements v. DSM Supply LLC*, No. 8:13-CV-1096-T-33EAJ, 2014 WL 560561, at *1 (M.D. Fla. Feb. 13, 2014) (holding that treble damages of $1,500.00 per call were appropriate for each fax received after Claimant's written request to cease communications); *Sengenberger v. Credit Control Services, Inc.*, 2010 U.S. Dist. LEXIS 43874 (N.D. Ill. May 5, 2010) (granting summary judgment on TCPA claim and finding that an intentional act equates to willfully or knowingly and awarded treble damages of $1,500 per facsimile); *A Fast Sign Co., Inc. v. Am. Home Servs., Inc.*, 734 S.E.2d 31 (Ga. 2012) (affirming $459 million dollar verdict based upon $1,500 for each of the 306,000 faxes sent).

Given the record evidence and the undisputed fact that Plaintiff revoked any consent to be called using an ATDS, summary judgment on the knowing or willful nature of Defendant's TCPA violations is appropriate. The conduct exhibited by Defendant is exactly the sort of behavior that should entitle Plaintiff to $1,500.00 for each of the seventy-four calls made by defendant following Plaintiff's first revocation, totaling $111,000.00, or, in the alternative, for each of the fifty-seven calls made by the Defendant following Plaintiff's second revocation, totaling $85,500.00.

## CONCLUSION

It is respectfully requested that the Court enter a partial summary judgment order concluding that the Plaintiff is entitled to $111,000.00 in trebled damages for Defendant's seventy-four calls after March 14, 2016 in willful or knowing violation of the TCPA—or $85,500.00 in trebled damages for Defendant's fifty-seven calls after March 18, 2016. Alternatively, Plaintiff

asks for her statutory minimum damages of $500 per call or $37,000.00 for Defendant's seventy-four calls—or $28,500 for Defendant's fifty-seven calls.

## <u>CERTIFICATE OF SERVICE</u>

I, Stefan A. Alvarez, hereby certify that on April 17, 2017, I caused a copy of the foregoing to be electronically filed with the Clerk of the District Court using the CM/ECF system, which will provide electronic notice of the filing to all counsel of record.

Respectfully submitted,

*/s/ Stefan A. Alvarez*
Stefan A. Alvarez, Esq.
Florida Bar No.: 100681
Stefan@TheConsumerProtectionFirm.com
William Peerce Howard, Esq.
Florida Bar No.: 010330
Billy@TheConsumerProtectionFirm.com
THE CONSUMER PROTECTION FIRM, PLLC
210-A South MacDill Avenue
Tampa, FL 33609
Telephone: (813) 500-1500
Facsimile: (813) 435-2369
Attorneys for Plaintiff