# EXHIBIT H

1              IN THE UNITED STATE DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF FLORIDA

3                  JACKSONVILLE DIVISION

4                  *  *  *  *  *  *  *  *  *

5                              *

6   MELONIE BRATCHER,          *

7        Plaintiff            *   Case No.

8        vs.                  *   3:16-CV-00519-HES-JBT

9   NAVIENT SOLUTIONS, LLC,    *

10       Defendant             *

11                             *

12                  *  *  *  *  *  *  *  *  *

13              VIDEOTAPED DEPOSITION

14                       OF

15               ANGELA KAMIONKA

16               March 10, 2017

17

18

19

20

21

22

23        Any reproduction of this transcript

24       is prohibited without authorization

25           by the certifying agency.

| | |
|---|---|
| 1 | VIDEOTAPED DEPOSITION |
| 2 | OF |
| 3 | |
| 4 | ANGELA KAMIONKA, taken on behalf of the Plaintiff |
| 5 | herein, pursuant to the Rules of Civil Procedure, taken |
| 6 | before me, the undersigned, Lindsey Deann Richardson, a |
| 7 | Court Reporter and Notary Public in and for the |
| 8 | Commonwealth of Pennsylvania, at the offices of |
| 9 | Sargent's Court Reporting Service, Inc., 22 East Union |
| 10 | Street, Suite 305, Wilkes-Barre, Pennsylvania, on |
| 11 | Friday, March 10, 2017 beginning at 10:17 a.m. |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

```
 1              A P P E A R A N C E S

 2

 3   STEFAN ALVAREZ, ESQUIRE

 4   The Consumer Protection Firm

 5   210-A South Macdill Avenue

 6   Tampa, FL  33609

 7      COUNSEL FOR PLAINTIFF

 8        (VIA TELEPHONE)

 9

10   DAYLE M. VAN HOOSE, ESQUIRE

11   RACHEL A. MORRIS, ESQUIRE

12   Sessions, Fishman, Nathan & Israel

13   3350 Buschwood Park Drive

14   Suite 195

15   Tampa, FL  33618

16      CO-COUNSEL FOR DEFENDANT

17        (VIA TELEPHONE)

18

19

20

21

22

23

24

25
```

```
 1              A P P E A R A N C E S (cont'd)

 2

 3    MATT SHELDON, ESQUIRE

 4    In-House Counsel

 5    Navient Solutions, LLC

 6    2001 Edmund Halley Drive

 7    Reston, VA  20191

 8        CO-COUNSEL FOR DEFENDANT

 9

10    ALSO PRESENT:

11    Wilton Vought, Legal Video Specialist

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

3   DISCUSSION AMONG PARTIES            8 -  9

4   WITNESS: ANGELA KAMIONKA

5   EXAMINATION

6       By Attorney Alvarez            9 - 91

7   DISCUSSION AMONG PARTIES          91 - 93

8   CERTIFICATE                            94

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    E X H I B I T S

2

3                                          PAGE

4    NUMBER       DESCRIPTION             IDENTIFIED

5    Exhibit 1    Audio Recording of

6                 Telephone Conversation

7                 Between Navient

8                 Representative Romeo and

9                 Melonie Bratcher              61

10   Exhibit 2    Audio Recording of

11                Telephone Conversation

12                Between Navient Representative

13                Jameel and Melonie Bratcher   73

14

15

16      (EXHIBITS ARE NOT ATTACHED TO THE TRANSCRIPT.)

17

18

19

20

21

22

23

24

25
```

```
 1                    O B J E C T I O N S

 2

 3

 4   ATTORNEY                                    PAGE

 5

 6   VAN HOOSE   21, 22, 22, 22, 25, 25, 39

 7   MORRIS      29, 31, 31, 32, 33, 33, 34, 35, 35, 36, 37,

 8   37, 38, 39, 42, 43, 43, 44, 46, 50, 51, 51, 51, 52, 55,

 9   57, 57, 58, 59, 59, 60, 63, 64, 68, 69, 69, 70, 70, 71,

10   73, 74, 77, 77, 77, 78, 78, 79, 80, 80, 81, 82, 82, 83,

11   84, 86, 87, 87, 88, 89, 89, 89, 90, 90

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2     ------------------------------------------------------

 3              VIDEOGRAPHER:

 4              We are now on the record in the matter of

 5     Bratcher, Melonie versus Navient Solutions,

 6     Incorporated.  Today's date is March 10, 2017.  The

 7     time is 10:17 a.m.  This is the video recorded

 8     deposition of Angela Kamionka being taken at Sargent's

 9     Court Reporting, 22 East Union Street, Wilkes-Barre,

10     Pennsylvania 18701.

11              My name is Wilton Vought.  I am the camera

12     operator representing First Choice Reporting and Video

13     Services, Incorporated located at 1080 Woodcock Road,

14     Suite 100, Orlando, Florida 32803.  The Court Reporter

15     is Lindsey Richardson with First Choice Reporting and

16     Video Services, Incorporated.

17              Will Counsel please introduce themselves.

18              ATTORNEY ALVAREZ:

19              Stefan Alvarez representing the Plaintiff,

20     Melonie Bratcher.

21              ATTORNEY VAN HOOSE:

22              Dayle Van Hoose representing the

23     Defendant, Navient Solutions, LLC.

24              ATTORNEY MORRIS:

25              Rachel Morris representing the Defendant,
```

1    Navient Solutions, LLC.

2                    ATTORNEY SHELDON:

3                    And Matt Sheldon.  I'm vice-president and

4    associate general counsel for Navient Solutions, LLC.

5                    VIDEOGRAPHER:

6                    Will the Court Reporter please swear in

7    the witness?

8                    COURT REPORTER:

9                    Ma'am, would you please raise your right

10   hand?

11   ----------------------------------------------------------

12   ANGELA KAMIONKA, HAVING FIRST BEEN DULY SWORN,

13   TESTIFIED AS FOLLOWS:

14   ----------------------------------------------------------

15                   VIDEOGRAPHER:

16                   Please proceed.

17   EXAMINATION

18   BY ATTORNEY ALVAREZ:

19   Q.   Good morning, Ms. Kamionka.

20   A.   Good morning.

21   Q.   And I just want to make sure.  Did I pronounce

22   that correctly before we proceed?

23   A.   Yes.

24   Q.   Okay.  First of all, I want to thank everyone,

25   especially Ms. Kamionka, for making it here today.  I

1    know you guys had a snowstorm up there.  So I

2    appreciate everyone trekking through the snow to make

3    this possible.

4         Ms. Kamionka, I just want to go over some initial

5    ground rules before we get started; okay?

6    A.    Okay.

7    Q.    So you are under oath and have to give accurate,

8    truthful answers in answer to my questions; okay?

9    A.    Yes.

10   Q.    And when you answer my questions today, I'm going

11   to assume you understood the question and are answering

12   it truthfully to the best of your ability.  Is that

13   fair?

14   A.    Yes.

15   Q.    Now, any time you realize that an yanswer was

16   untrue, or you just want to clarify, or you remember

17   something, you know, please feel free to let me know so

18   we can clear that up.  Will you do that for me?

19   A.    Yes.

20   Q.    And, of course, if you don't fully understand a

21   question, don't hesitate to ask me, and I'll clarify it

22   to the best of my ability; okay?

23   A.    Okay.

24   Q.    Now, is there anything about your health or memory

25   that prevents you from answering truthfully today?

1    A.    No.

2    Q.    And actually, just for the Court Reporter's

3    purposes, will you state and spell the name for the

4    record?

5    A.    Me?

6    Q.    Yes.

7    A.    Oh, sorry.  Angela Kamionka, A-N-G-E-L-A,

8    K-A-M-I-O-N-K-A.

9    Q.    And Ms. Kamionka, are you represented by counsel

10   today?

11   A.    Yes.

12   Q.    And who is your attorney?

13   A.    Matt Sheldon.

14            ATTORNEY VAN HOOSE:

15            And obviously, we put on the record Dayle

16   Van Hoose with the Sessions firm and Rachel Morris with

17   the Sessions firm as well.

18            ATTORNEY ALVAREZ:

19            Sure.  Thank you, Dayle.

20   BY ATTORNEY ALVAREZ:

21   Q.    Ms. Kamionka, did you discuss this case with

22   anyone prior to today's deposition?

23   A.    No.

24   Q.    How did you prepare for today's deposition?

25   A.    Spoke about where the meeting would be.

| | |
|---|---|
| 1 | ATTORNEY VAN HOOSE: |
| 2 | And Andrea, he's not asking you to discuss |
| 3 | anything you may have discussed with your lawyers.  And |
| 4 | so I just want to make that clear to the extent that, |
| 5 | you know, you didn't --- just don't disclose anything |
| 6 | that you've discussed with your lawyers.  That would be |
| 7 | privileged.  I don't think your asking that, right, |
| 8 | Stefan? |
| 9 | ATTORNEY ALVAREZ: |
| 10 | No.  Thank you, Dayle.  And yes. |
| 11 | BY ATTORNEY ALVAREZ: |
| 12 | **Q.   Ms. Kamionka, just to clarify, obviously, I don't** |
| 13 | **want you to get into anything that might be** |
| 14 | **attorney/client privilege.  Just generally, you know,** |
| 15 | **how did you prepare for today's deposition, excluding** |
| 16 | **conversations that you might have had with your** |
| 17 | **attorney?** |
| 18 | A.   Really just where the scheduling would be, the |
| 19 | timing, and who would be involved. |
| 20 | **Q.   And again, without going into any details of the** |
| 21 | **conversation, did you discuss your deposition today** |
| 22 | **with your attorneys?** |
| 23 | A.   I'm not sure what you mean. |
| 24 | **Q.   Did you have conversations with your attorneys** |
| 25 | **about today's deposition?** |

1    A.    Yes.

2    Q.    Okay.  Did you review any documents or audio

3    recordings prior to today's deposition?

4    A.    No.

5    Q.    Okay.  Now, I just want to go through a little bit

6    of background just to get to know you a little bit

7    better.  Obviously, none of these questions are meant

8    to pry or make you feel uncomfortable.  But again, I

9    just do need to get a little more background on you;

10   okay?

11   A.    Okay.

12   Q.    So Ms. Kamionka, where do you currently reside?

13   A.    Shickshinny, Pennsylvania.

14   Q.    And how long have you lived at your current

15   address?

16   A.    Three-and-a-half years.

17   Q.    And prior to that, where did you live?

18   A.    Drums, Pennsylvania.

19   Q.    And Ms. Kamionka, where did you go to school?  Did

20   you go to college?

21   A.    I took classes at Penn State.

22   Q.    And when did you take classes at Penn State?

23   A.    I don't recall the exact year.

24   Q.    Okay.  Did you graduate from Penn State?

25   A.    No.

1    Q.    Okay.   Do you have any professional

2    certifications?

3    A.    No.

4    Q.    What is your date of birth?

5    A.    November 17th, 1969.

6    Q.    And where were you born?

7    A.    Wilkes-Barre, Pennsylvania.

8    Q.    Have you been in Pennsylvania pretty much all your

9    life?

10   A.    Yes.

11   Q.    Okay.   So the snowstorm is nothing to you then.

12   Ms. Kamionka, have you ever been arrested?

13   A.    No.

14   Q.    Have you ever been convicted of a crime?

15   A.    No.

16   Q.    Have you sued anyone?

17   A.    No.

18   Q.    Have you yourself ever been sued?

19   A.    No.

20   Q.    Have you ever been the subject of debt collection

21   efforts?

22   A.    No.

23   Q.    Have you ever given your deposition?

24   A.    No.

25   Q.    So today is the first time that you've ever given

1    a deposition before; is that correct?

2    A.    Yes.

3    Q.    Okay.  Have you ever testified in court?

4    A.    Do you mean specifically for the company?

5    Q.    No.  Just at any time for any reason, have you

6    ever been a witness that's testified in court?

7    A.    No.

8    Q.    Have you ever testified on behalf of Navient

9    Solutions?

10   A.    No.

11   Q.    Okay.  So let's talk a little bit about your work

12   history.  What is your current title at Navient

13   Solutions?  And actually, before we proceed, for

14   clarity purposes and just to make it easier on

15   everybody, when I refer to Navient Solutions, I'll be

16   referring to Navient Solutions, LLC, formerly known as

17   Navient Solutions, Inc.  Is that okay?

18   A.    Yes.

19   Q.    Okay.  So what is your current title at Navient

20   Solutions?

21   A.    Senor director of the office of the customer

22   advocate.

23   Q.    How long have you been senor director at officer

24   of customer advocate --- or if you don't mind if I

25   refer to it as OCA just to make it easier?

1   A.   Sure.  Two years.

2   Q.   **And what was your position prior to becoming the**

3   **senor director of OCA?**

4   A.   The director of OCA.

5   Q.   **Okay.  How long were you the director of OCA?**

6   A.   Two years.

7   Q.   **And what about before being the director?  What**

8   **was your role at Navient Solutions?**

9   A.   Quality.

10   Q.   **Quality.  What do you mean by quality?**

11   A.   Quality control.

12   Q.   **Okay.  So you worked in quality control prior to**

13   **becoming the director of OCA?**

14   A.   Yes.

15   Q.   **What was your title in quality control?**

16   A.   Director.

17   Q.   **And how long were you the director for quality**

18   **control?**

19   A.   Approximately four years.

20   Q.   **I know I'm starting to go back a little further**

21   **here, but what was your position prior to becoming the**

22   **director of quality control at Navient Solutions?**

23   A.   I was in --- I was the manager in OCA.

24   Q.   **And how many years were you the manager?**

25   A.   It was maybe a year.  I'm not positive.

1    Q.    Okay.  About a year, though?

2    A.    Yes.

3    Q.    Okay.  And what did you do before becoming the

4    manager at OCA?

5    A.    I was the manager over credit bureau reporting.

6    Q.    Okay.  I know this is probably getting a little

7    boring, but how many years were you the manager of

8    credit bureau reporting?

9    A.    I'm going to guess approximately four.

10   Q.    Okay.  So how many years total have you worked for

11   Navient Solutions?

12   A.    It will be 28 years this May.

13   Q.    Oh, wow.  Does that mean you're close to retired?

14   A.    No.

15   Q.    Otherwise, I was going to congratulate you, but

16   okay.  So prior to becoming the manager of credit

17   bureau reporting, what was your role at Navient

18   Solutions?  If you actually --- just to make it easy,

19   if you want to just go from that --- from that time,

20   whatever your role was before becoming the manager of

21   credit bureau reporting, and kind of go through each of

22   your positions at Navient Solutions for me?

23   A.    Okay.  And I should probably clarify, when I was

24   in quality, I also had responsibility for complaint

25   tracking for a portion of that time.

1    Q.    Okay.

2    A.    And prior to credit bureau reporting, I worked in

3    monetary lock box area.  Prior to that ---.

4    Q.    And I'm sorry.  I didn't mean to interrupt you.

5    But you said monetary lock box?

6    A.    Yes.

7    Q.    Okay.  Again, I apologize for interrupting you.

8    Go ahead.

9    A.    Prior to that, I was in a department called

10   account adjustments.  Prior to that, I believe I was in

11   exports.  We're going way back now.  And prior to that,

12   loan acquisitions.

13   Q.    Okay.  Is that where you got your start at Navient

14   Solutions, in loan acquisitions?

15   A.    Yes.

16   Q.    Okay.  And again, I know this is going way back,

17   but what did you do prior to you joining Navient

18   Solutions?

19   A.    I started at Navient when I was 19, so I worked at

20   Leslie Fay for one year prior.

21   Q.    Okay.  All right.  So from loan acquisitions,

22   let's fast forward back to today in your current role

23   as senior director of OCA; okay?

24   A.    Yes.

25   Q.    What are some of your daily duties and

1  responsibilities as the senior director of OCA?

2  A.   Sure.  My responsibilities are managing staff and

3  volume for complaints received at the company through

4  regulators, executives and customers directly to our

5  department, as well as possible internal escalations to

6  our team.  So we work with customers to understand

7  their concerns and resolve their issues.

8  Q.   Okay.  And so that's kind of --- is that the role

9  of the office of customer advocate, to field complaints

10  and attempt to resolve those complaints with customers?

11  A.   Yes.

12  Q.   And how does OCA go about resolving any complaints

13  with customers?

14  A.   That's very broad.  It would depend on the

15  situation.

16  Q.   Okay.  And, you know, we can, in a little bit, get

17  a little more specific.  But, you know, just generally

18  if you receive a complaint from a customer, what would

19  be one of the ways that you would approach resolving

20  that complaint?

21  A.   Certainly the first way would be trying to speak

22  with the customer, to understand their concerns and

23  review their specific account with them.

24  Q.   Okay.  So when was the office of customer advocate

25  established at Navient Solutions?

1    A.    I'm not sure of the year.

2    Q.    **Okay.  Do you have a supervisor in your role as**

3    **senior director of OCA?**

4    A.    I do.

5    Q.    **And who is that supervisor?**

6    A.    Lisa Stashik.

7    Q.    **I'm going to have to have you spell that name for**

8    **me.  Can you spell her full name for me?**

9    A.    Sure.  Lisa, L-I-S-A, Stashik, S-T-A-S-H-I-K.

10   Q.    **Okay.  And what is Ms. Stashik's title?**

11   A.    Vice president.

12   Q.    **Is that vice president of OCA or vice president of**

13   **Navient Solutions?**

14   A.    Vice president of customer experience.

15   Q.    **Customer experience; okay.  And who is Ms.**

16   **Stashik's supervisor?**

17   A.    Jeff Whorley.

18   Q.    **And again, do you mind spelling his last name for**

19   **the record?**

20   A.    Sure.  It's W-H-O-R-L-E-Y, I believe.

21   Q.    **And is his title president of customer experience?**

22   A.    I'm not sure.

23   Q.    **Okay.  But he is Ms. Stashik's direct supervisor;**

24   **is that correct?**

25   A.    Yes.

1  Q.    Okay.  Ms. Kamionka, during your time as director

2  of quality control, you mentioned that you were also

3  responsibile for complaint tracking; is that right?

4  A.    Yes.

5  Q.    What does that entail?

6                ATTORNEY VAN HOOSE:

7                I want to make an objection to form to the

8  last question prior to this one, and also object to

9  form to this question as well.  But you can answer,

10  Angela.

11  BY ATTORNEY ALVAREZ:

12  Q.    Yeah.  You can answer, Ms. Kamionka.

13  A.    So complaint --- when I was in complaint tracking,

14  I worked with companies across --- I worked with

15  business areas across the company to train them and

16  report on escalated inquiries or complaints captured in

17  their business area.

18  Q.    What were the different types of business areas

19  that you were --- that these individuals were working

20  in?

21  A.    Customer service call center, collections,

22  customer-facing business areas.

23  Q.    Okay.  Now, Ms. Kamionka, in any of your roles,

24  but--- well, actually let's start --- let's start with

25  your current role as senior director of OCA.  Have you

1  been tested on the TCPA or the Telephone Consumer

2  Protection Act?

3  A.   I'm not sure what you mean when you say tested.

4  Q.   I guess do you receive any sort of training on the

5  Telephone Consumer Protection Act or the TCPA?

6  A.   I'm not sure.

7  Q.   Do you undergo any sort of training in your role

8  as senior director of OCA at Navient Solutions?

9  A.   Yes.

10  Q.   Okay.  And is that training --- when does that

11  training take place?

12                    ATTORNEY VAN HOOSE:

13                    Object to form.  But you can answer,

14  Angela.

15  A.   I'm sorry.  Did you say when or where?

16  BY ATTORNEY ALVAREZ:

17  Q.   Yeah, I apologize.  When does your training take

18  place?

19                    ATTORNEY VAN HOOSE:

20                    Same objection.

21  A.   Throughout the year.

22  BY ATTORNEY ALVAREZ:

23  Q.   And do you recall ever being trained on the TCPA

24  as part of that annual training?

25                    ATTORNEY VAN HOOSE:

1              Object to form, but go ahead.

2    A.    Yes.

3    BY ATTORNEY ALVAREZ:

4    **Q.    Okay.  So you have received training on the TCPA;**

5    **is that correct?**

6    A.    Yes.

7    **Q.    Do you receive that training on the TCPA every**

8    **year?**

9    A.    I'm not sure.  I don't recall.

10   **Q.    Did you receive training on the TCPA in 2016?**

11   A.    I don't recall if that was one of the courses.

12   **Q.    Okay.  How was your training administered?**

13   A.    It's a regulation, new training platform, to log

14   in, read material and take a test.

15   **Q.    Okay.  And you can't remember if you have taken a**

16   **test specifically on the TCPA recently?**

17   A.    I cannot.

18   **Q.    Okay.  Have you received any training on the Fair**

19   **Debt Collections Practices Act or the FDCPA?**

20   A.    Yes.

21   **Q.    Okay.  When did you receive that training?**

22   A.    I don't remember.

23   **Q.    Do you remember if you were trained on the FDCPA**

24   **in 2016?**

25   A.    I'm not positive.

1    Q.    And again, is that --- is that training also

2    administered through the online course and test?

3    A.    Yes.

4    Q.    And what about the Florida Consumer Collection

5    Practices Act?  Or for clarity purposes, I'll refer to

6    it as the Florida Act.  Have you received any training

7    on the Florida Act?

8    A.    I don't recall.

9    Q.    Do these training tests or modules that you take

10   each year require a certain percentage to pass?

11   A.    Yes.

12   Q.    And what is that percentage?

13   A.    I'm not positive.

14   Q.    Do you know what happens if you don't pass the

15   training module the first time?

16   A.    Yes.

17   Q.    What happens if you fail the first time?

18   A.    You have a chance to retake the test.

19   Q.    And how many chances do you get to retake the

20   test?

21   A.    I believe three times.

22   Q.    Okay.  So do managers or someone like yourself or

23   a supervisor undergo any additional or different

24   training than a collector might at Navient Solutions?

25   A.    Possibly.  I'm not sure what a collector takes.

1    Q.    Okay.   Do you recall what your most recent

2    training was about?

3    A.    I'm not sure.

4    Q.    Let me ask you this.   Do you have knowledge of the

5    what the TCPA is and how it applies to Navient

6    Solutions?

7                    ATTORNEY VAN HOOSE:

8                    Objection.   Stefan, she's not here as a

9    lawyer to answer legal conclusions.   She can testify to

10   any specific knowledge she may have.   But, you know, to

11   the extent you're asking her for legal conclusions,

12   she's not a lawyer.

13                   ATTORNEY ALVAREZ:

14                   No, I understand.   I'm not asking for any

15   legal conclusions.

16   BY ATTORNEY ALVAREZ:

17   Q.    I'm just asking, Ms. Kamionka, based on your

18   experience and training over the years at Navient

19   Solutions, what is your understanding of the TCPA?

20                   ATTORNEY VAN HOOSE:

21                   Object to form and same objection.

22                   ATTORNEY ALVAREZ:

23                   Okay.   And your objection is noted for the

24   record.

25   BY ATTORNEY ALVAREZ:

1    Q.    **Ms. Kamiona, you can answer.**

2    A.    Okay.  Can you repeat the question?

3    Q.    **Sure.**

4                ATTORNEY ALVAREZ:

5                Actually, Madame Court Reporter, do you

6    mind reading back the last question?

7                COURT REPORTER:

8                I apologize if I butcher your last name.

9    Ms. Kamionka ---

10   A.    Kamionka (corrects pronunciation).

11               COURT REPORTER:

12               --- Kamionka, based on your experience and

13   training over the years at Navient Solutions, what is

14   your understanding of the TCPA?

15   A.    So my understanding is that there --- certain

16   processes need to be taken for consent for telephone

17   calls.

18   BY ATTORNEY ALVAREZ:

19   Q.    **Okay.**

20               ATTORNEY VAN HOOSE:

21               Stefan, I do need to take a brief break.

22               ATTORNEY ALVAREZ:

23               That's fine.

24               ATTORNEY VAN HOOSE:

25               Okay.  Matt, I'll call you --- let's go

1   off the record.

2           VIDEOGRAPHER:

3           We're off the record at 10:49.

4   OFF VIDEO

5   SHORT BREAK TAKEN

6   ON VIDEO

7           VIDEOGRAPHER:

8           We are back on the record at 10:55.

9   Please proceed.

10   BY ATTORNEY ALVAREZ:

11   **Q.   All right.  Ms. Kamionka, what happens internally**

12   **at Navient Solutions when a complaint is received from**

13   **a consumer?**

14   A.   I'm not sure what you mean.

15   **Q.   Well, I guess, tell me --- walk me through what**

16   **happens at Navient Solutions when a consumer lodges a**

17   **complaint against a collector, for example?**

18   A.   That's difficult to answer without more context.

19   **Q.   Give me just a general kind of step-by-step**

20   **process that would take place.  And then as we go**

21   **through, I can always try to narrow it down for you.**

22   **But just generally, if a consumer complains about a**

23   **collection call from Navient Solutions, what happens?**

24   **What happens next?**

25   A.   If a consumer complains about a specific call, the

1    advocate would pull that call and listen to the call.

2    Q.    Okay.  So then let me ask this.  Maybe we'll go

3    back to the very beginning.  How does Navient Solutions

4    actually capture complaints?

5    A.    We have a tracking database where we log

6    complaints.

7    Q.    And what's the name of that tracking database?

8    A.    It's the customer satisfaction interface or CSI.

9    Q.    Customer satisfaction interface?

10   A.    Yes.

11   Q.    Going back to actually capturing the initial

12   complaint, how do you actually ensure that a complaint

13   during a call is being captured?

14   A.    I'm not sure what you mean.

15   Q.    Well, you told me the --- how does the tracking

16   database --- how does CSI actually operate?

17   A.    So it's a database that is used to enter

18   information regarding the customer and their concern,

19   and research completed regarding the issue.

20   Q.    So it actually requires a human to input the

21   original complaint; is that correct?

22   A.    Yes.

23   Q.    Okay.  So I guess my question is how does Navient

24   Solutions ensure that the individual required to move

25   the complaint to the CSI database is actually doing

1    that?

2                    ATTORNEY MORRIS:

3                    Object to form.  You can answer if you

4    know .

5    A.   I'm sorry.  Did you say I can answer?

6                    ATTORNEY MORRIS:

7                    Yes.

8                    ATTORNEY ALVAREZ:

9                    Yes.

10   A.   Typically, volume received in the department such

11   as a call is assigned through our assigner to an

12   advocate.

13   BY ATTORNEY ALVAREZ:

14   Q.   Okay.  Ms. Kamionka, those are some real inside

15   baseball terms.  Can you just --- can you tell me as

16   simply and in laymen's terms as possible what that

17   means?

18   A.   That means if a customer complaint is received,

19   it's assigned to a specific employee in the department

20   to work.  And the assignments are reconciled to what's

21   tracked in the database.

22   Q.   Okay.  So going back to my customer call example,

23   if a customer is on a call with a collection agent, and

24   they make a complaint about the call that they're

25   receiving, is it then the collection agent's

1    **responsibility to pass that complaint along?**

2    A.    I'm not sure about collections practices.

3    **Q.    Okay.  But your office is in charge of monitoring**

4    **and compiling complaints that might take place during**

5    **collection calls; is that correct?**

6    A.    Can you restate that?

7                    ATTORNEY ALVAREZ:

8                    Madam Court Reporter, do you mind reading

9    back the last question?

10                   COURT REPORTER:

11                   Okay.  But your office is in charge of

12   monitoring and compiling complaints that might take

13   place during collection calls; is that correct?

14   A.    No.

15   BY ATTORNEY ALVAREZ:

16   **Q.    So your office does not handle any complaints made**

17   **during an active call with a collection agent?**

18   A.    No.

19   **Q.    Who handles those complaints within Navient**

20   **Solutions?**

21   A.    On an active --- can you repeat that?  I'm not

22   understanding what you're asking.

23   **Q.    So an agent, a collection agent, from Navient**

24   **Solutions calls a customer.  During that phone call,**

25   **the customer complains about the phone call that they**

1   **are receiving.  What happens next at Navient Solutions?**

2   A.   I couldn't speak for the collections business

3   area.

4   **Q.   So does your office not receive those types of**

5   **complaints?**

6                ATTORNEY MORRIS:

7                Object to form.

8   A.   Is that --- was that a question?

9   BY ATTORNEY ALVAREZ:

10  **Q.   That was a question, yes.  Does your office not**

11  **receive those types of complaints?**

12                ATTORNEY MORRIS:

13                Same objection.

14  A.   Yes.

15  BY ATTORNEY ALVAREZ:

16  **Q.   I'm sorry.  Yes, they do or yes, they do not?**

17  A.   Yes, my office can receive complaints about

18  collections.

19  **Q.   Okay.  And how does that process work from the**

20  **initial complaint to your office receiving it?**

21  A.   Complaints are received in our department through

22  e-mail from the customer, a letter from the customer,

23  correspondence from a regulator, or a direct call into

24  our office or an internal escalation.

25  **Q.   Okay.  So internal escalation complaints, what**

1    does that mean?

2    A.    That means if a customer-facing business area

3    transfers a customer to OCA to handle.

4    **Q.    And when you say customer-facing business area,**

5    **would that include the collections call centers?**

6    A.    Yes.

7    **Q.    Again, those escalated complaints from, for**

8    **example, the collections call centers, how do those**

9    **complaints make it from the initial phone call to your**

10   **office?**

11   A.    Any of the ways I mentioned previously.

12   **Q.    Is Navient Solutions monitoring calls from the**

13   **collections call centers?**

14                    ATTORNEY MORRIS:

15                    Object to form.  Angela, you can answer if

16   you know.

17   A.    Call monitoring is performed, yes.

18   BY ATTORNEY ALVAREZ:

19   **Q.    And does OCA receive complaints from call**

20   **monitoring staff?**

21   A.    No.

22   **Q.    So who specifically within the collections call**

23   **centers would pass along a complaint to OCA?**

24   A.    I can't say specifically, but typically, someone

25   in management.

1    Q.   And when you say management, management of what
2    department?
3    A.   Their department, their own department,
4    collections.
5    Q.   The management of collections, okay.  I got you.
6    Now, during any of your time or your 28 years at
7    Navient Solutions, or during your role as the quality
8    control director where you included complaint tracking,
9    did you ever see or know how --- a complaint made
10   directly to a collector, how that was captured by the
11   collector and then passed along to their manager?
12                   ATTORNEY MORRIS:
13                   Object to form.  I'm sorry.  I didn't even
14   understand the question.
15                   ATTORNEY ALVAREZ:
16                   Yeah.  I apologize.  That was a pretty bad
17   question.  Let me rephrase and break it up.
18   BY ATTORNEY ALVAREZ:
19   Q.   During any of your years at Navient Solutions, did
20   you ever observe how a complaint made directly to a
21   collector was then passed along to that collector's
22   manager?
23                   ATTORNEY MORRIS:
24                   Object to form.  Still confusing.  Angela,
25   if you know, of course, you can answer.

1  A.   I need you to clarify when you say observe.

2  BY ATTORNEY ALVAREZ:

3  **Q.   I guess just generally during your entire 28 years**

4  **at Navient Solutions, did you ever come to know the**

5  **process for a collector to pass along a complaint made**

6  **to them to their manager?**

7              ATTORNEY MORRIS:

8                  Object to form.  Again, same objection.

9  A.   Yes.

10  BY ATTORNEY ALVAREZ:

11  **Q.   Okay.  And what was that or what is that process?**

12  A.   I don't know what that process is now.

13  **Q.   Okay.  When did you know or when were you aware of**

14  **that process?**

15  A.   More so when I was over quality and complaint

16  tracking.

17  **Q.   Okay.  And in your capacity as --- in quality**

18  **control for complaint tracking, what was the process**

19  **then?**

20  A.   Specifically for which department or is

21  there ---?

22  **Q.   Collections department.**

23  A.   There's more than one collections department, so

24  I'm not sure ---

25  **Q.   Okay.**

1    A.    --- which area.

2    Q.    **Tell me --- walk me through the process for each**

3    **collections department.**

4                ATTORNEY MORRIS:

5                Object to form.  Is there a question?

6                ATTORNEY ALVAREZ:

7                There is a question out there, yes.

8    BY ATTORNEY ALVAREZ:

9    Q.    **Ms. Kamionka, do you need me to repeat my**

10   **question?**

11   A.    Please.

12   Q.    **Well, let me ask you this.  How many different**

13   **collections departments are there?**

14   A.    I'm not even positive.  Two that I'm aware of

15   under servicing.

16   Q.    **Okay.  And what are those two departments?**

17   A.    One is collections for federal student loans and

18   one is collections for private student loans.

19   Q.    **Okay.  So let's take the collections department**

20   **for federal student loans.  For that department, what**

21   **is the process for a collector to capture and pass**

22   **along a complaint made by a consumer during a call to**

23   **their manager?**

24                ATTORNEY MORRIS:

25                Object to form.  Same objection.  I don't

1   see a question.

2   BY ATTORNEY ALVAREZ:

3   **Q.   You can answer, Ms. Kamionka.**

4   A.   So I'm not positive what the exact process is

5   today.  But many years ago when I was in quality and

6   complaint tracking, if the collector on the phone could

7   not resolve the customer's issue and they asked to be

8   escalated, once the call was escalated to --- it would

9   try to be handled internally within that department

10  through internal escalation.  If management was not

11  able to resolve and the customer still asked to be

12  escalated, it would be sent to OCA.

13  BY ATTORNEY ALVAREZ:

14  **Q.   Okay.  Would this only happen if the customer**

15  **requests for their call to be escalated or for their**

16  **complaint to be escalated?**

17  A.   I can't say for sure.

18  **Q.   Does Navient Solutions or OCA have a policy and**

19  **procedure in place for escalated complaints?**

20              ATTORNEY MORRIS:

21              Objection to the extent she's not a

22  corporate representative.  I think those issues were

23  discussed during the corporate representative

24  deposition.

25              ATTORNEY ALVAREZ:

| | |
|---|---|
| 1 | Well, I mean, again, thank you for the |
| 2 | speaking objection.  But she is the director of --- |
| 3 | senior director of OCA.  So I'm sure aware she's aware |
| 4 | of any policies and procedures that that department |
| 5 | specifically has regarding escalated complaints. |
| 6 | BY ATTORNEY ALVAREZ: |
| 7 | **Q.   And that's --- my question is limited to OCA's** |
| 8 | **policy and procedure for escalated complaints.  Ms.** |
| 9 | **Kamionka, would you like me to repeat the question?** |
| 10 | A.   Yes, please. |
| 11 | **Q.   Okay.  So did OCA have a policy and procedure for** |
| 12 | **escalating complaints during an actual collection** |
| 13 | **calls?** |
| 14 | A.   No. |
| 15 | **Q.   Do you know if Navient Solutions has a policy and** |
| 16 | **procedure in place for escalating complaints during** |
| 17 | **collection calls?** |
| 18 | ATTORNEY MORRIS: |
| 19 | Again, same objection. |
| 20 | A.   Yes. |
| 21 | BY ATTORNEY ALVAREZ: |
| 22 | **Q.   Do you know what that policy and procedure is?** |
| 23 | A.   I don't. |
| 24 | ATTORNEY MORRIS: |
| 25 | Objection. |

1   BY ATTORNEY ALVAREZ:

2   **Q.    I'm sorry.  I couldn't here you, Ms. Kamionka.**

3   A.    Am I able to answer?

4           ATTORNEY MORRIS:

5           Yes, if you can.

6           ATTORNEY ALVAREZ:

7           Yes.

8   A.    Yes.

9   BY ATTORNEY ALVAREZ:

10  **Q.    Okay.  What is that policy and procedure?**

11  A.    I'm not positive.

12  **Q.    I'm sorry, you said yes, you do know what the**

13  **policy and procedure is; is that correct?**

14  A.    I know there is a policy.  I just don't know the

15  specifics, the procedure, actually.

16  **Q.    What qualifies as a complaint at Navient**

17  **Solutions?**

18          ATTORNEY MORRIS:

19          Object to form.  You can answer.

20  A.    A complaint would be something received in the

21  office of the customer advocate where the customer was

22  upset with a product, service or employee.

23  BY ATTORNEY ALVAREZ:

24  **Q.    So the only complaints received and stored by OCA**

25  **are complaints that are proactively escalated by**

1    customers themselves; is that correct?

2                    ATTORNEY VAN HOOSE:

3                    Object to form.  I think that's a

4    mischaracterization of her response.

5    BY ATTORNEY ALVAREZ:

6    Q.   Ms. Kamionka, I'm not trying to trick you.  I'm

7    just trying to get clarification.

8    A.   Can you repeat your question?

9    Q.   Sure.  Does the office of customer advocate only

10   receive complaints that are proactively escalated or

11   requested to be escalated by customers?

12                   ATTORNEY MORRIS:

13                   Object to form.  Same objection.

14   A.   No.

15   BY ATTORNEY ALVAREZ:

16   Q.   Who makes the determination within Navient

17   Solutions as to what would be considered an escalated

18   complaint that's not requested by the customer to be

19   escalated?

20   A.   Can you repeat?

21                   ATTORNEY ALVAREZ:

22                   Madam Court Reporter, can you read back

23   the last question?

24                   COURT REPORTER:

25                   Who makes the determination within Navient

1    Solutions as to what would be considered an escalated

2    complaint that's not requested by the customer to be

3    escalated?

4    A.   Again, it's broad.  I'm not sure without more

5    context.

6                   ATTORNEY MORRIS:

7                   This is Rachel is stepping in.  I know

8    that we --- we're coming up on about 30 minutes since

9    our last break.  Does Angela or Matt need to feed the

10   meter?

11                  ATTORNEY SHELDON:

12                  No.  I think we can go a little longer.

13   It feels like it's only been about 15 minutes.

14   A.   Yeah.  Yeah.

15                  ATTORNEY MORRIS:

16                  Okay.

17                  ATTORNEY SHELDON:

18                  We'll shout out when we need to take a

19   break.

20                  ATTORNEY MORRIS:

21                  Okay.

22                  ATTORNEY ALVAREZ:

23                  Yeah.  Thank you, guys.

24   BY ATTORNEY ALVAREZ:

25   **Q.   Ms. Kamionka, what additional context would help**

1    **you answer that question?**

2    A.   And I'm sorry.  I need you to repeat the question

3    again.

4    **Q.   Not a problem.**

5               ATTORNEY ALVAREZ:

6               Madam Court Reporter, would you please

7    read back the last question again?

8               COURT REPORTER:

9               Who makes the determination within Navient

10   Solutions as to what would be considered an escalated

11   complaint that's not requested by the customer to be

12   escalated?

13   A.   So what I mean by context is there's not --- it's

14   not --- are you looking for one specific person?  I

15   mean, what ---?

16   BY ATTORNEY ALVAREZ:

17   **Q.   No.  I'm just looking in general for you to tell**

18   **me who or how that determination is made.  And again,**

19   **there's no right or wrong answer here.**

20   A.   Yeah.  I'm not really sure I know how to answer

21   that question.

22   **Q.   Well, I guess the question is, OCA receives**

23   **complaints made against Navient Solutions that aren't**

24   **always requested to be escalated by customers; is that**

25   **correct?**

```
 1              ATTORNEY MORRIS:

 2                  Object to form.

 3   A.    That's correct.

 4   BY ATTORNEY ALVAREZ:

 5   Q.    Okay.  Those complaints --- strike that.

 6         Let me restate it.  How are those types of

 7   complaints escalated to OCA?

 8   A.    Various ways ---

 9   Q.    Okay.

10   A.    --- dependent on the situation.  That's why it's

11   hard to --- without a specific example, it's hard to

12   answer that.

13   Q.    Give me one way that can happen.

14   A.    A customer e-mails our communications department

15   and that department replies to them.  And the customer

16   e-mails back maybe a few times, and they're still not

17   understanding or unhappy with the response or

18   dissatisfied with something.  That department may make

19   the decision to ask OCA to review.

20   Q.    Okay.  But it's up to the department then, at that

21   point, to determine whether or not that complaint would

22   be escalated to you guys; is that correct?

23   A.    Yes.

24   Q.    Otherwise, is the burden always on the customer to

25   continue escalating the complaint at Navient Solutions?
```

1          ATTORNEY MORRIS:

2              Object to form.

3    A.   Yes.

4    BY ATTORNEY ALVAREZ:

5    Q.   Okay.  So if a customer doesn't take on that

6    responsibility to continue escalating the complaint,

7    what kind of check and balances are in place at Navient

8    Solutions to ensure that that complaint is heard by the

9    proper channels?

10             ATTORNEY MORRIS:

11             Object to form.  Again, she's not the

12   corporate representative.  You know, she can testify as

13   to what she knows in her role.  But overall generally,

14   you know, she can't testify to general practices.

15             ATTORNEY ALVAREZ:

16             Sure.  And again, I'd just ask that the

17   objections be limited to form rather than speaking

18   objections.

19   BY ATTORNEY ALVAREZ:

20   Q.   Again, Ms. Kamionka, I'm only asking based on your

21   role as senior director of OCA, as well as your

22   experience over 28 years at Navient Solutions, which

23   included complaint tracking at quality control.

24   A.   What was the question?

25   Q.   Do you want me to restate the question?

1    A.   Yes, please.

2              ATTORNEY ALVAREZ:

3              Madam Court Reporter, do you mind reading

4    back the last question?

5              COURT REPORTER:

6              Question.  Okay.  If a customer doesn't

7    take on that responsibility to continue escalating a

8    complaint, what kind of check and balances are in place

9    at Navient Solutions to ensure that the complaint is

10   heard by the proper channels?

11             ATTORNEY MORRIS:

12             Again, object to form.

13   A.   I would say business area review, quality QC,

14   quality control, other controls within the business

15   area, but I couldn't speak to specifics.

16   BY ATTORNEY ALVAREZ:

17   **Q.   Once an escalated complaint makes it to OCA, what**

18   **happens next?**

19   A.   As stated previously, we would try to contact the

20   customer to ensure we understand their concerns and

21   then research the account to resolve their issue.

22   **Q.   Okay.  Is one of the first things that's done once**

23   **OCA receives a complaint is to actually input that**

24   **complaint into the CSI database?**

25   A.   Yes.

1   Q.   Okay.  And I know OCA --- does OCA maintain the
2   CSI database?
3   A.   No.
4   Q.   Who maintains the CSI database?
5   A.   The complaint tracking and reporting team.
6   Q.   Complaint tracking and reporting team; is that
7   correct?
8   A.   Yes.
9   Q.   Is that a separate department or is that within a
10  department at Navient Solutions?
11  A.   It's a department within Navient.
12  Q.   And who's the manager or supervisor at that
13  department?
14  A.   Hans Stullken.
15  Q.   Can you spell that first and last name for the
16  record?
17  A.   Yes, it's H-A-N-S.  And Stullken is
18  S-T-U-L-L-K-E-N.
19  Q.   And I know you spent some time in complaint
20  tracking.  What exactly does the complaint tracking
21  reporting team do to maintain the CSI database?
22  A.   I'm not sure I understand what you say when you
23  say maintain.
24  Q.   Well, I guess taking a step back, what does the
25  complaint tracking and reporting team do at Navient

1   Solutions?

2   A.   They're responsible for compiling escalated

3   inquiry and complaint volume, and reporting and working

4   with business areas that utilize the database on any

5   issues or training.

6   **Q.   Okay.  And the complaint and the escalated**

7   **complaints that are compiled and stored in the CSI**

8   **database, how are they stored?**

9   A.   I'm not sure what you mean.

10  **Q.   What format are the complaints stored in?**

11  A.   Still not sure what you mean.

12  **Q.   Are they PDFs?**

13  A.   Can you please clarify?  Is what a PDF?

14  **Q.   An actual escalated complaint that's stored within**

15  **the CSI database?**

16  A.   So the CSI database is what the --- what is used

17  to track the information from the customer.

18  **Q.   Okay.  And how is that communication stored in the**

19  **CSI database to be tracked?**

20  A.   It's manually entered.

21  **Q.   Okay.  So Ms. Kamionka, I'm asking you to paint me**

22  **a picture.  If I'm sitting in front of my computer and**

23  **I want to go to the CSI database, what does it look**

24  **like?**

25                  ATTORNEY MORRIS:

1            Object to form.  I don't know what you

2   mean, either.  But Angela, if you know, go ahead.

3   A.   It looks like a database where you can enter

4   customer-specific information related to their concern.

5   BY ATTORNEY ALVAREZ:

6   **Q.   Is it searchable?**

7   A.   Some fields.

8   **Q.   What fields are searchable?**

9   A.   I don't know off the top of my head.

10  **Q.   Can you search terms to find what you're looking**

11  **for within the CSI database?**

12  A.   No.  The database, you can search to find a

13  customer's case within the database.

14  **Q.   Okay.  What other ways are you able to search**

15  **within the database?**

16  A.   Within the database, there isn't another way to

17  search.

18  **Q.   So the database has different categories of types**

19  **of complaints?**

20  A.   It does.

21  **Q.   What are those categories?**

22  A.   I don't know them all.

23  **Q.   Name me one category.**

24  A.   That we would enter into the database, is that

25  what you're asking?

1  Q.  Yes.

2  A.  Customer name account number.

3  Q.  Well, I guess I meant category for type of

4  complaint.  So, for example, is there a category

5  complaint related to a customer's request for calls to

6  stop?

7  A.  For --- I'm sorry.  Can you repeat that?  It's

8  hard to hear sometimes.

9  Q.  Sure.  I apologize.  Is there a category within

10  the database for complaints related to a customer's

11  request for calls to stop?

12  A.  I'm not sure.

13  Q.  Is that something that Hans Stullken, the

14  supervisor of the complaint tracking and reporting

15  team, would now?

16  A.  I'm not sure.

17  Q.  How long are the complaints stored in the CSI

18  database?

19  A.  Right now, indefinitely.

20  Q.  How many complaints are currently stored in the

21  database?

22  A.  I don't know that number off the top of my head.

23  Q.  Are you able to --- are you able to find that

24  number easily?

25  A.  Right now?

1    Q.    I'm sorry?

2    A.    Are you asking if I'm able to find that number

3    right now?

4    Q.    No.  What I'm asking is, is that number readily

5    accessible to you or any other employee at Navient

6    Solutions?

7    A.    I can get OCA historical volume from my own

8    internal reporting.

9    Q.    And what about complaints that are escalated from

10   the collections department?

11   A.    I'm not sure what the question is.

12   Q.    Are those complaints readily accessible to the

13   manager of the collections department?

14   A.    Reports need --- you can't search the database.

15   You'd have --- reports are needed to search that data.

16   Q.    I'm sorry.  What's needed?

17   A.    You can't search the database on those fields.

18   You'd have to export the data.  And then, yes, the

19   business area could identify complaints assigned to

20   their business area.

21   Q.    Okay.  So essentially, when you say export, do you

22   mean whatever is stored in the database can be exported

23   to an Excel spreadsheet, for example?

24   A.    Yes.

25   Q.    And then once that information is exported to the

1    Excel spreadsheet, then, for example, the collections

2    department could sort based on their own department; is

3    that correct?

4    A.    Yes.

5    Q.    And someone could also search based off of the

6    type of complaint; is that correct?

7    A.    Yes.

8    Q.    And once information is exported to that Excel

9    spreadsheet, you're also able to use search terms;

10   correct?

11   A.    Yes.

12   Q.    So, for example, if an escalated complaint was

13   related to a customer's repeated request for calls to

14   stop --- Navient Solutions could use the search term

15   stop calling me to locate those complaints; is that

16   correct?

17                  ATTORNEY MORRIS:

18                  Object to form.

19   A.    Yes.

20   BY ATTORNEY ALVAREZ:

21   Q.    How many complaints related to the TCPA has

22   Navient Solutions received over the last two years?

23   A.    I don't know.

24   Q.    Is that something that could be readily accessible

25   or that is readily accessible to Navient Solutions,

1   though; correct?

2            ATTORNEY MORRIS:

3            Object to form.  And again, she's a, you

4   know, non-corporate representative.

5   BY ATTORNEY ALVAREZ:

6   Q.    You can answer, Ms. Kamionka.

7   A.    The data is in the database.  But the search

8   capabilities, it's --- there's generic terms that you

9   can search from, yes.

10  Q.    And okay, when you say generic terms, for example,

11  TCPA or Telephone Consumer Protection Act could be such

12  a search term; is that correct?

13  A.    Yes.

14  Q.    Do you know how many complaints Navient Solutions

15  has received by consumers about repeated phone calls

16  after requests for the calls to stop?

17            ATTORNEY MORRIS:

18            Object to form.

19  A.    I don't know.

20  BY ATTORNEY ALVAREZ:

21  Q.    Again, though, that's something that is housed in

22  the CSI database; correct?

23            ATTORNEY MORRIS:

24            Object to form.

25  A.    I don't know if there's a specific complaint

1   reason that's titled TCPA.  It may be a generic term

2   such as phone calls.

3   BY ATTORNEY ALVAREZ:

4   **Q.    Okay.  But again, if a complaint regarding**

5   **repeated calls after request for the calls to stop is**

6   **then escalated, that would be stored in the CSI**

7   **database; correct?**

8   A.    Escalated to whom?

9   **Q.    Escalated either to OCA or the manager at the**

10  **collections department.**

11  A.    Yes.  It should be tracked.

12  **Q.    Now, when you're saying it should be tracked, the**

13  **only guarantee that it's tracked is if the customer**

14  **themselves request for those --- for that complaint to**

15  **continually be escalated; is that correct?**

16  A.    I'm not sure I understand your question.  There's

17  two different --- can you rephrase?

18  **Q.    A complaint is --- a complaint will absolutely get**

19  **escalated if a customer continually requests for that**

20  **complaint to be escalated.  Is that fair to say?**

21              ATTORNEY MORRIS:

22              Object to form.

23  A.    It should.

24  BY ATTORNEY ALVAREZ:

25  **Q.    However, if the customer themselves is not**

1    requesting for the complaint to be escalated, there's

2    no guarantee that that complaint is being captured and

3    escalated internally at Navient Solutions; is that

4    correct?

5    A.   Correct.

6              ATTORNEY MORRIS:

7              Do you guys --- are you guys okay?  Do you

8    guys need to feed the meter?  It's been about, I think,

9    25 minutes since I last checked the clock.

10   A.   Yeah, it's 11:45 now.  I think we need to check.

11             ATTORNEY SHELDON:

12             Yeah, that's fine.  I mean, if you've got

13   one more question or you want to round it out ---.

14             ATTORNEY ALVAREZ:

15             If you guy don't mind, I've got one more

16   question and then we can take a break.

17             ATTORNEY SHELDON:

18             Yeah, that's fine.  Finish up whatever

19   this line is.  That's totally fine.  Then we'll go put

20   some quarters in the meter.

21             ATTORNEY ALVAREZ:

22             Okay.  Thanks, guys.

23   BY ATTORNEY ALVAREZ:

24   Q.   Ms. Kamionka, so a single complaint by a customer

25   on a collection call is generally insufficient for

1    escalation; is that correct?

2    A.    Again, it's a broad question.

3    Q.    Okay.  Let me ask it this way.  If a customer

4    receives a phone call from a collection agent at

5    Navient Solutions and tells that agent stop calling me.

6    Please, stop calling me.  I don't want you guys calling

7    me again, and then hangs up on that agent, is that

8    something that would be escalated?

9    A.    I couldn't speak for the collections department.

10   Q.    So the only certain way for a complaint like that

11   to be escalated, is that the customer during that call

12   requests to speak to either a manager, or that it's

13   passed along to OCA by that manager; is that correct?

14   A.    I also couldn't speak to their business procedure.

15   Q.    Well, I'm just asking in your role as senior

16   director of OCA how you would receive a complaint like

17   that?

18   A.    If a complaint is sent to OCA, we would receive it

19   and work it.  And it can be received through the ways I

20   mentioned earlier.

21             ATTORNEY ALVAREZ:

22             Okay.  Let's do this, guys.  We can go

23   ahead and go off the record and take a quick break so

24   you can take care of the parking meter.

25             VIDEOGRAPHER:

```
 1                    We're off the record at 11:44.  This
 2    concludes disc one.
 3    OFF VIDEO
 4    LUNCH BREAK TAKEN
 5    ON VIDEO
 6                    VIDEOGRAPHER:
 7                    We're back on the record at 12:32 p.m.
 8    This is disc two in the continuing deposition of Angela
 9    Kamionka.  Please proceed.
10    BY ATTORNEY ALVAREZ:
11    Q.    Good afternoon, Ms. Kamionka.
12    A.    Good afternoon.
13    Q.    Okay.  I hope you guys had a good lunch.
14    A.    Yes.
15    Q.    Okay.  So the customer tells a collection agent
16    for Navient Solutions, quote, I'm already taking care
17    of my student loans.  Stop calling me.  I've already
18    made arrangements.  I don't want you guys calling me
19    again.  Thank you very much.  And then hangs up on that
20    agent.  Is it the customer's duty to ask for that
21    complaint to be escalated?
22                    ATTORNEY MORRIS:
23                    Object to form.  It sounds like a legal
24    conclusion to me.  Angela, answer based on what you
25    know.
```

```
 1    A.    Was your question ---?
 2    BRIEF INTERRUPTION
 3              COURT REPORTER:
 4              Sorry.  I'm trying to turn it up.  Go
 5    ahead.
 6    A.    Could you repeat your question?  I'm sorry.
 7    BRIEF INTERRUPTION
 8              VIDEOGRAPHER:
 9              Can you hear us?
10              ATTORNEY ALVAREZ:
11              I'm sorry.  I keep hearing some beeping.
12    Can you guys hear me okay?
13              COURT REPORTER:
14              Sorry, yes.  It's the Court Reporter.  I'm
15    trying to turn the volume up so I can hear you better.
16              ATTORNEY ALVAREZ:
17              Okay.  I apologize.  Is that better for
18    you?
19              COURT REPORTER:
20              Yes.  Thank you.
21              ATTORNEY ALVAREZ:
22              Okay.
23    A.    Could you repeat your question?
24    BY ATTORNEY ALVAREZ:
25    Q.    Sure.  If a customer tells a collection agent
```

1   during a call, quote, I'm already taking care of my

2   student loans.  Stop calling me.  I've already made

3   arrangements.  I don't want you guys calling me again.

4   Thank you very much, and then hangs up on the

5   collection agent, is that something that needs to be

6   requested by the customer to be escalated to the

7   manager, and then sent to OCA?

8               ATTORNEY MORRIS:

9               Object to form.  Same objection.

10   A.   Again, I couldn't speak to the customer facing

11   business line procedures.

12   BY ATTORNEY ALVAREZ:

13   Q.   Well, I'm just asking in your 28 years experience

14   as an employee at Navient Solutions, which has included

15   complaint tracking, is that something you would

16   consider a complaint by a customer?

17               ATTORNEY MORRIS:

18               Object to form.

19   A.   Without having a specific account or more context,

20   that's difficult to say.

21   BY ATTORNEY ALVAREZ:

22   Q.   Okay.  What additional context would you need to

23   be able to ---?

24   A.   A specific account, a scenario.

25   Q.   I'm sorry.  Can you repeat?  I'm sorry.  I just

1    didn't hear you.  Can you repeat that?

2    A.    I'm sorry.  A different --- a specific account or

3    scenario to review.  I mean, I couldn't say if someone

4    hung up on a collector and said stop calling me for

5    sure whether that would be captured as a complaint or

6    escalated inquiry.

7    Q.    Okay.  How would that complaint make its way to

8    your office without the customer asking to escalate it?

9    A.    Possibly through call listening.

10   Q.    What do you mean by call listening?

11   A.    Call listening internally by the business area,

12   call listening by the quality team, or calibration

13   calls across different business lines.

14   Q.    Is every call with a Navient customer monitored?

15   A.    No.

16   Q.    So it's possible complaints like these by

17   customers are not being escalated to a manager by the

18   collection agent?

19              ATTORNEY MORRIS:

20              Object to form.

21   A.    Yes.

22   BY ATTORNEY ALVAREZ:

23   Q.    So whether or not a complaint during an actual

24   active call with a collection agent is escalated is

25   solely up to that collection agent; is that correct?

```
1                    ATTORNEY MORRIS:

2                       Object to form.

3    A.   I honestly couldn't speak to that.  I'm not sure

4    what the business practice is for live call monitoring.

5    I don't know.

6    BY ATTORNEY ALVAREZ:

7    Q.   So if an agent doesn't pass along a complaint to

8    their manager, and there was no call monitoring of that

9    call, it would never get documented with OCA; is that

10   correct?

11                   ATTORNEY MORRIS:

12                      Object to form.

13   A.   Correct.

14   BY ATTORNEY ALVAREZ:

15   Q.   Okay.  Again, based on your 28 years experience at

16   Navient and all the various roles that you've served,

17   when a customer states stop calling me, I asked you

18   guys to stop call me before.  Don't call me again.  Is

19   that something that the collector should escalate to

20   their supervisor?

21                   ATTORNEY MORRIS:

22                      Again.  Objection.  Object to form.

23   A.   I believe it's something that the collector could

24   handle and resolve for the customer.

25   BY ATTORNEY ALVAREZ:
```

1    **Q.    How would they go about resolving that with the**
2    **customer?**
3    A.    If the specific request was to stop calling me, to
4    follow the process in place for that business area to
5    make that happen.
6    **Q.    Okay.   What if a customer, after making that**
7    **request, immediately hangs up on the agent?   What**
8    **should the collection agent do then?**
9                ATTORNEY MORRIS:
10               I'd like to object and just again remind
11   you, Stefan, that she's not the corporate
12   representative.   She can't speak to company policies.
13   Just what she knows in her role.
14               ATTORNEY ALVAREZ:
15               Yeah.   No.   And again, I think I've
16   prefaced this line of questioning was based on her
17   28 years experience in the various roles, including her
18   time in complaint tracking with quality control to now.
19   BY ATTORNEY ALVAREZ:
20   **Q.    I'm just asking based on your experience, Ms.**
21   **Kamionka.**
22   A.    I need to ask you to repeat the question.
23               ATTORNEY ALVAREZ:
24               Madam Court Reporter, can you read back
25   the last question?

1          COURT REPORTER:

2              Okay.  What if a customer, after making

3    that request, immediately hangs up on the agent.  What

4    should the collection agent do then?

5    A.   I would think they should report that the customer

6    hung up and call the customer back, or whatever the

7    process is in that business area for contact.

8          ATTORNEY ALVAREZ:

9              Okay.  Madam Court Reporter, can you play

10   for the witness, I believe, what's been premarked as

11   Exhibit 1.  It's Bates labeled NSI75.

12              (Whereupon, Plaintiff's Exhibit 1, Audio

13              Recording of Telephone Conversation

14              Between Navient Representative Romeo and

15              Melonie Bratcher, was marked for

16              Identification.)

17          COURT REPORTER:

18              Yes.  Can we go off the record for me to

19   get that audio file?

20          ATTORNEY ALVAREZ:

21              Sure.

22          VIDEOGRAPHER:

23              We're off the record at 12:40.

24   OFF VIDEO

25   SHORT BREAK TAKEN

```
 1    OFF RECORD DISCUSSION

 2    ON VIDEO

 3                VIDEOGRAPHER:

 4                Back on the record.  Please wait for my

 5    signal.  We're back on the record at 12:43.  Please

 6    proceed.

 7                COURT REPORTER:

 8                Okay.  I am now going to play the witness

 9    the exhibit file.

10    AUDIO RECORDING PLAYED

11                ROMEO:

12                Hello, good morning.  Melonie Bratcher?

13                MS. BRATCHER:

14                Yes.

15                ROMEO:

16                Hi, ma'am.  This call may be recorded.  My

17    name is Romeo from Navient.  My employee code is

18    C49534.  I'm calling to ---.

19                MS. BRATCHER:

20                Okay.  I'm going to stop you right now.

21    I'm already taking care of my student loans.  And I'd

22    just like for you guys to stop calling me.

23                ROMEO:

24                I see.  How did you take care of that one,

25    ma'am?
```

1              MS. BRATCHER:

2              Because I've already made arrangements

3    with the Department of Education.

4              ROMEO:

5              I see.  I understand that, Ms. Bratcher,

6    but I'm not representing the Department of Education.

7              MS. BRATCHER:

8              I know you're not.  You're representing

9    Navient, which is also being sued.  So I don't want you

10   guys calling me again.  Thank you very much.

11             ROMEO:

12             Ms. Bratcher?

13   AUDIO RECORDING STOPPED

14   BY ATTORNEY ALVAREZ:

15   Q.   Ms. Kamionka, were you able to hear that clearly?

16   A.   Yes.

17   Q.   Okay.  And you heard Ms. Bratcher's complaint

18   during that call?

19             ATTORNEY MORRIS:

20             Objection to form.

21   A.   I heard her ask for calls to be stopped.

22   BY ATTORNEY ALVAREZ:

23   Q.   Okay.  Unless that call was randomly selected for

24   monitoring by Navient Solutions, if the collection

25   agent didn't pass that complaint along to supervisors,

1    would it have made it to your office?

2              ATTORNEY MORRIS:

3              Objection to form.  And again, you know,

4    she is not the corporate representative.  She's not

5    here to testify about overall policies and procedures,

6    but what's in her knowledge and her role in her

7    department.

8    BY ATTORNEY ALVAREZ:

9    Q.   You can answer, Ms. Kamionka.

10   A.   The question being could it have made it to my

11   office if it wasn't from the customer?

12   Q.   Yes.

13   A.   There's a possibility, yes, that it --- I couldn't

14   say without a hundred percent certainty either way.

15   Q.   Do you know if your office currently has a

16   complaint on file for Ms. Bratcher's account?

17   A.   I don't.

18   Q.   So unless Ms. Bratcher asked for a manager during

19   that call, it's possible that her complaint was never

20   documented with OCA and into the CSI database; is that

21   correct?

22   A.   They don't --- a customer doesn't need to ask for

23   a manager.  They could just ask to speak with someone

24   else, escalate.  But again, business areas have their

25   own internal escalation procedures where they try to

1   resolve the issue for the customer before having to get

2   OCA involved.

3   Q.    Okay.  Once OCA receives a complaint, do you guys

4   conduct an investigation?

5   A.    Yes.  We review and research the account and the

6   customer's concerns, yes.

7   Q.    Okay.  Have you personally conducted

8   investigations on behalf of OCA?

9   A.    Yes.

10  Q.    How many investigations would you say you've

11  conducted?

12  A.    I couldn't say.

13  Q.    More than a hundred?

14  A.    Yes.

15  Q.    More than 200?

16  A.    Probably.

17  Q.    So you've conducted hundreds of investigations

18  during your time at OCA; is that correct?

19  A.    Yes.

20  Q.    Okay.  And what's the typical turnaround time from

21  OCA's receipt of a complaint to when that investigation

22  begins?

23  A.    Twenty-four (24) to 48 hours.

24  Q.    And after ---?

25  A.    Business hours.

1  Q.    I'm sorry.  Go ahead.

2  A.    Twenty-four (24) to 48 business hours.

3  Q.    And what happens in those 24 to 48 business hours

4  when you first receive a complaint?

5  A.    Depending on how it is received --- again, it

6  could come through the mail.  It could come through an

7  e-mail.  Someone goes through the different mediums of

8  work and then assigns that out to an employee to

9  review.  So then the employee may review the customer's

10 account.  If it's an e-mail, read their e-mail, try to

11 understand what their question or concern is, review

12 their account and then give them a call.

13 Q.    And I'm sorry, to clarify, is all of that

14 occurring within the first 24 to 48 hours?

15 A.    We definitely try to reach the customer within

16 48 hours to let them know we've received the complaint

17 and we're reviewing.

18 Q.    Okay.  And then I know you're saying you typically

19 try to make contact, initial contact with the customer

20 within 48 hours.  What's the typical time frame for an

21 actual resolution to the complaint to take place?

22 A.    Depends on this --- on the issue.

23 Q.    Sure.  I'm sure there's a wide range.  But I mean,

24 you know, given --- taking your hundreds of

25 investigations that you conducted over your years

1    there, what would you say the average timetable for a

2    response or for a resolution to take place?

3    A.   It really is difficult to answer.  It's case by

4    case depending on research needed, if data needs to be

5    requested from another department.  It's, I couldn't

6    answer ---

7    Q.   Okay.

8    A.   --- average.

9    Q.   That's fine.  I understand.

10        So let's say this specific case.  Have you ever

11   conducted an investigation regarding a complaint from a

12   customer for calls to stop and those calls not

13   stopping?

14   A.   Yes.

15   Q.   Okay.  Can you tell me about that investigation?

16   A.   I don't have one specific example.  I know I have.

17   I don't have one specific account off the top of my

18   head to talk about.

19   Q.   Okay.  Well, I mean, you can speak generally.

20   When you received these types of complaints, what is

21   the first thing what you do as the investigator?

22   A.   If someone is asking about stopping calls?

23   Q.   Well, yeah.  Actually, first before, we go into

24   that, let me ask you when you receive --- when you

25   investigated a complaint by a customer for calls to

1    **stop and those calls not stopping, how did you**

2    **initially receive the complaint?**

3    A.    Again, it could have been through --- not speaking

4    about any specific complaint, but we can receive them

5    through a regulator, directly from a customer, through

6    an internal escalation.

7    **Q.    So let's go with internal escalation for right**

8    **now.**

9    A.    Okay.

10   **Q.    So you have received a complaint by a customer for**

11   **calls to stop and the calls have not stopped by Navient**

12   **Solutions.   And it's been internally escalated to your**

13   **office.   What happens next?**

14   A.    We would start review of the account and

15   confirmation of the request from the customer and reach

16   out to the customer.

17   **Q.    Would you attempt to stop the calls being placed**

18   **to the customer?**

19                    ATTORNEY MORRIS:

20                    Object to form.

21   A.    Are you talking specifically about TCPA or just

22   cease and desist?

23   BY ATTORNEY ALVAREZ:

24   **Q.    I'm talking specifically if a customer states stop**

25   **calling me.   I don't want you guys calling me again, as**

1    **Ms. Bratcher did in that recording that you listened**

2    **to.  If --- when you initially get that complaint at**

3    **OCA, do you attempt to stop the calls from occurring?**

4              ATTORNEY MORRIS:

5              Object to form again.

6    A.   Yes.  In OCA, we would try to have the calls

7    stopped, especially while we're researching the account

8    to determine what occurred.

9    BY ATTORNEY ALVAREZ:

10   **Q.   How would you try to make that happen?**

11   A.   Request the appropriate business area to have the

12   calls stopped.

13   **Q.   Okay.  But there's no guarantee that you can stop**

14   **the calls with that request?**

15             ATTORNEY MORRIS:

16             Object to form.

17   A.   The process is to submit the request and have the

18   request processed.

19   BY ATTORNEY ALVAREZ:

20   **Q.   How long does it typically take for a request like**

21   **that to be processed?**

22   A.   Not long, a couple of days, one day to three days,

23   business days.

24   **Q.   Okay.  So now you started your investigation.**

25   **What happens?  What would --- what do you do next on a**

1  **case like this?**

2  A.   Probably pull calls that occurred with the

3  customer to understand what that conversation was and

4  what the request was.

5  **Q.   Okay.  During this time while you're conducting**

6  **your investigation, and you may or may not have tried**

7  **to send a request to have the calls stopped, the calls**

8  **are continuing typically; is that correct?**

9              ATTORNEY MORRIS:

10             Objection.  It's --- you're asking her to

11 speculate.

12 BY ATTORNEY ALVAREZ:

13 **Q.   You can answer the question, Ms. Kamionka.**

14 A.   Can you repeat?

15 **Q.   During this time that your investigating, and**

16 **while a request may or may not be pending for calls to**

17 **stop, the calls to the customer could be continuing;**

18 **correct?**

19             ATTORNEY MORRIS:

20             Again, same objection.  Asking her to

21 speculate.

22 A.   They can, yes, if the system, the ---hasn't been

23 stopped yet.

24 BY ATTORNEY ALVAREZ:

25 **Q.   Sure.  Okay.**

1  A.   And we don't try to request it.  We request that

2  calls be stopped.

3  Q.   But ultimately, it's not up to you for the calls

4  to be stopped; is that correct?

5                 ATTORNEY MORRIS:

6                 Objection.  Object to form.

7  A.   No.

8  BY ATTORNEY ALVAREZ:

9  Q.   But again, going back to our example, so Ms.

10  Bratcher's complaint, once you begin the investigation

11  and reviews the calls, do you also then enter that

12  complaint onto the customer's account and in the CSI

13  database?

14  A.   Yes.  We record the complaint that was received in

15  the CSI database, and we also notate it on the system

16  where the loan is housed.

17  Q.   Okay.  When you say notate it in the system --- so

18  if a customer has lodged a complaint and it's worked

19  its way through all these various internal processes to

20  get to OCA, and you've now entered it into the CSI

21  database, is that flag on the customer's account for

22  everyone else that's active in the account in Navient

23  Solutions?

24  A.   There's not a flag, but there's a notation on the

25  --- in the customer's history that says OCA is working

1    the account.  And this was --- this is the concerns

2    from the customer, and what we're doing to research.

3    **Q.    Okay.  And when you say it's notated that OCA is**

4    **investigating, where would, let's say, an employee in**

5    **the collections department, see that on the customer's**

6    **account?**

7    A.    Again, I couldn't speak to --- I mean, there's

8    different platforms.  So I don't know which platform

9    they would be using.  But the system where the loan is

10   housed, it's notated right there on that servicing

11   system.

12   **Q.    And that servicing system, are we talking about**

13   **the CSI data?**

14   A.    No.

15   **Q.    Okay.  What servicing system are you referring to?**

16   A.    Our class system ---

17   **Q.    Okay.**

18   A.    --- for federal loans.

19   **Q.    Okay.  And so would an OCA investigation be**

20   **notated on the class --- I believe it's 155 system, the**

21   **critical changes system?**

22   A.    No, not include ---.

23   **Q.    Okay.  Which class system would it be notated on?**

24   A.    The 151.

25   **Q.    151, okay.  And you don't know if Ms. Bratcher's**

1    complaint that you heard in that recording was ever

2    escalated, do you?

3    A.    I don't.

4    Q.    If it was escalated, would that complaint be

5    housed in Navient Solutions' CSI database?

6    A.    Do you mean escalated to OCA?

7    Q.    Yes, and then input into the CSI database.

8    A.    Yes.

9    Q.    And again, the only way to guarantee that Ms.

10   Bratcher's complaint was escalated, was either if she

11   requested for it to be escalated, or if the collection

12   agent determined that, or decided to pass that along to

13   his supervisor; correct?

14                   ATTORNEY MORRIS:

15                   Object to form.

16   A.    I couldn't say for sure.  You say guarantee.  I

17   don't know.

18                   ATTORNEY ALVAREZ:

19                   Madam Court Reporter, can we play what's

20   Bates labeled NSI78?  And I believe they're pre-marked

21   as Plaintiff's Exhibit 2.

22                   (Whereupon, Plaintiff's Exhibit 2, Audio

23                   Recording of Telephone Conversation

24                   Between Navient Representative Jameel and

25                   Melonie Bratcher, was marked for

```
 1                    Identification.)
 2              COURT REPORTER:
 3              Just give me one moment.  Okay.  I'm now
 4    playing the witness the second audio exhibit.
 5    AUDIO RECORDING PLAYED
 6              JAMEEL:
 7              Hello, Melonie?  Melonie Bratcher?
 8              MS. BRATCHER:
 9              Yes.
10              JAMEEL:
11              Hi, this is Jameel from Navient.
12              MS. BRATCHER:
13              Yes.  I asked you guys not to call me any
14    more.  I'm getting an attorney and I'm going to sue you
15    guys now.  Have a good day.  Don't call me again.
16    AUDIO RECORDING STOPPED
17    BY ATTORNEY ALVAREZ:
18    Q.   Ms. Kamionka, were you able to hear the recording
19    clearly?
20    A.   Yes.
21    Q.   Again, your 28 years of experience which has
22    included complaint tracking, quality control, and now
23    in your role as senior director of OCA, would you
24    consider that a complaint by a customer?
25              ATTORNEY MORRIS:
```

1           I'm going to issue an objection to that to

2    the extent you're seeking to have her testify about

3    matters more appropriately testified during the

4    corporate representative's deposition as to Navient's

5    policies and procedures.

6                ATTORNEY ALVAREZ:

7                Again, I'd ask --- I'm sorry.  I thought

8    you were done.

9                ATTORNEY MORRIS:

10               And, you know, you can answer that

11   question from your own knowledge.

12               ATTORNEY ALVAREZ:

13               And just for the record, I just again,

14   would ask counsel to limit their objections to the

15   proper objection, which is to object to form rather

16   than speaking objections, which are tending to coach

17   the witness.

18   A.   And I'm sorry.  Can you repeat the question,

19   again?

20               ATTORNEY ALVAREZ:

21               Madam Court Reporter, can you read back

22   the question?

23               COURT REPORTER:

24               Again, in your 28 years of experience,

25   which included complaint tracking, quality control, and

1  now in your role as senior director of OCA, would you

2  consider that a complaint by a customer?

3  A.   Yes.  I would consider that an escalated inquiry

4  received in that business area or should be treated as

5  so.

6  BY ATTORNEY ALVAREZ:

7  **Q.   So that conversation and request by Ms. Bratcher**

8  **is something that should be escalated; ---**

9  A.   Yes.

10  **Q.   --- is that correct?**

11  A.   Yes.

12  **Q.   And is that complaint by Ms. Bratcher something**

13  **that should then be escalated by the collection**

14  **department manager to OCA to handle?**

15  A.   No.  Collections would use their internal business

16  processes to resolve the issue for that customer

17  themselves.  They should try to do that first.

18  **Q.   Okay.  If it was then escalated to OCA, would that**

19  **be found in Navient Solutions' CSI database?**

20  A.   Yes.

21  **Q.   How often do you investigate complaints by**

22  **customers for calls to stop?**

23  A.   I couldn't say.

24  **Q.   So is it possible that someone such as Ms.**

25  **Bratcher, who complains on that recording that you just**

1   listened to, that the customer's request for these

2   calls to stop, and to not be called again are not being

3   escalated by Navient Solutions?

4                   ATTORNEY MORRIS:

5                   Object to form.

6   A.   No.

7   BY ATTORNEY ALVAREZ:

8   Q.   Can you explain, what do you mean by no?

9   A.   I thought I heard you say or --- would I --- I'm

10  sorry.  I thought I heard you say would you consider

11  that escalated inquiry to get to OCA every time.

12  Q.   No.  Let me --- so let me rephrase.  It's possible

13  that similar to Ms. Bratcher's complaint of --- to not

14  call anymore.  Don't call me again.  I'm getting an

15  attorney and suing you guys now.  Don't call me again.

16  That that type of complaint by customers is going

17  unnoticed by Navient Solutions?

18                  ATTORNEY MORRIS:

19                  Object to form.

20  A.   No, I don't --- not to my knowledge.

21  BY ATTORNEY ALVAREZ:

22  Q.   Okay.  But as you testified earlier, unless Ms.

23  Bratcher asked for the complaint to be escalated, it

24  would have been dependent on the agent to escalate that

25  complaint; correct?

1          ATTORNEY MORRIS:

2               Object to form and mischaracterization of

3      her testimony.

4      BY ATTORNEY ALVAREZ:

5      **Q.    Again, feel free to clarify, Ms. Kamionka.**

6      A.    Yes.   No.   I believe I stated that I don't know

7      the business rules or procedures for live listening, or

8      quality or calibration sessions.   So I couldn't say.   I

9      couldn't answer that question.

10     **Q.    Okay.   But let me ask it this way.   There are**

11     **three ways a complaint can be escalated during a**

12     **collection call; is that correct?**

13     A.    I don't know.   Can you specify the three ways?

14     **Q.    Sure.   One way for a complaint to be escalated**

15     **during an actual collection call is if the customer**

16     **requests for that complaint to be escalated; correct?**

17     A.    Correct.

18     **Q.    The second way for a complaint to be escalated**

19     **during collection call is if the collection agent**

20     **themselves escalate that complaint; is that correct?**

21     A.    Correct.

22     **Q.    And that escalation by the collection agent would**

23     **happen without the customer ever requesting for it to**

24     **be escalated; correct?**

25          ATTORNEY MORRIS:

1          Object to form.

2     A.   Could be both.

3     BY ATTORNEY ALVAREZ:

4     Q.   **Okay.  And then another way for a complaint to be**

5     **escalated would be if there happened to be call**

6     **monitoring staff listening in to the call and heard the**

7     **complaint take place; correct?**

8     A.   That or business area listening.

9     Q.   **Okay.**

10    A.   Supervisor listening.

11    Q.   **And that was going to be my next question.  When**

12    **you say business area, you mean an manager for a**

13    **collection department?**

14    A.   Yes.

15    Q.   **Okay.  So there's really four mechanisms in place**

16    **at Navient Solutions to potentially escalate a**

17    **complaint like what Ms. Bratcher made during that call**

18    **recording; correct?**

19    A.   Correct.

20    Q.   **So that complaint by Ms. Bratcher is something**

21    **that should have been notated on the account and**

22    **escalated; correct?**

23              ATTORNEY MORRIS:

24              Object to form, asking her to speculate.

25    A.   Correct.

1    BY ATTORNEY ALVAREZ:

2    **Q.   And what happens internally if that complaint was**

3    **not escalated?**

4    A.    Internally for who?

5    **Q.   What happens within Navient Solutions if that call**

6    **--- or that complaint is not escalated?**

7    A.    Again, I'm not sure what you mean.

8    **Q.   Would the call continue if that complaint was not**

9    **escalated?**

10   A.    I don't know.

11   **Q.   There would be no reason for the calls to stop if**

12   **that complaint was not escalated; correct?**

13                  ATTORNEY MORRIS:

14                  Object to form.

15   A.    I mean, the goal is for the agent to try to work

16   with the customer to resolve their issues.

17   BY ATTORNEY ALVAREZ:

18   **Q.   Sure.  But based on those recordings that you**

19   **listened to, it didn't sound like anything was**

20   **resolved.  It was Ms. Bratcher complaining for them to**

21   **stop calling and the calls not stopping.  If that**

22   **complaint was not escalated, there would be no reason**

23   **for Navient to stop calling; correct?**

24                  ATTORNEY VAN HOOSE:

25                  Object to form.

1    A.   Calls would not stop unless the appropriate system

2    fields were updated to stop the calls, yes.

3    BY ATTORNEY ALVAREZ:

4    **Q.   So again, I know it's hard to get exact numbers.**

5    **But in your hundreds of investigations that you**

6    **conducted at OCA, how many would you say involve**

7    **similar complaints to the ones Ms. Bratcher made?**

8    A.   I really couldn't say.

9    **Q.   More than a hundred?**

10   A.   I honestly couldn't --- I wouldn't know that

11   without looking at my --- I have nothing here to refer

12   to.

13   **Q.   I'm sorry, you were going to say what would you go**

14   **to to refer or to find out that information?**

15   A.   To the reports from the database.

16   **Q.   So okay.  So you're saying the easiest way to find**

17   **out that information would be to look into the CSI**

18   **database?**

19                ATTORNEY MORRIS:

20                Object to form and mischaracterization of

21   her testimony.

22   A.   No, I'm saying that's how I would go about.  I

23   wouldn't guess on a number.  I couldn't say how many

24   complaints I thought were for any complaint reason.  I

25   couldn't give a number or percentage without reviewing

1    my volume.

2    BY ATTORNEY ALVAREZ:

3    **Q.   Okay.  But you could access that information;**

4    **correct?**

5    A.   Yes.

6    **Q.   Okay.  Does NSI distinguish between formal**

7    **complaints and informal complaints?**

8              ATTORNEY MORRIS:

9              Object.

10   A.   Do you mean CSI?

11   BY ATTORNEY ALVAREZ:

12   **Q.   I mean --- I apologize.  I have NSI and CSI on the**

13   **brain.  I might be losing it.  Let me re-ask the**

14   **question.  Does Navient distinguish between normal**

15   **complaints and informal complaints?**

16             ATTORNEY MORRIS:

17             Again, same objection.

18   A.   I'm not sure what you're referencing when you say

19   formal complaint versus informal.

20   BY ATTORNEY ALVAREZ:

21   **Q.   Okay.  So when we first started talking, you said**

22   **that there are four buckets of complaints, complaints**

23   **from regulators, complaints from executives, complaints**

24   **from customers, and then internal escalation; is that**

25   **correct?**

1    A.    Yes.

2    **Q.    Would any of those buckets be considered formal or**

3    **informal?**

4    A.    We don't categorize anything in that way, formal

5    or informal.

6    **Q.    Okay.  So they're all lumped together in the CSI**

7    **database if they're escalated and make it to OCA;**

8    **correct?**

9    A.    Correct.

10   **Q.    Okay.  So once a complaint, for example, from a**

11   **customer repeatedly requesting for calls to stop and**

12   **those calls not stopping.  Once OCA fields that**

13   **complaint and begins an investigation, is there any**

14   **sort of disciplinary action that takes place?**

15                   ATTORNEY MORRIS:

16                   Object to form.

17   A.    Disciplinary action regarding what and who?

18   BY ATTORNEY ALVAREZ:

19   **Q.    Regarding a collection agent's handling of the**

20   **call with a customer?**

21   A.    OCA would not take any disciplinary action.  OCA

22   would provide feedback to that business area, and ask

23   for a response.

24   **Q.    In that area --- I'm sorry, go ahead.**

25   A.    And ask for them to review and take action,

1    provide feedback or whatever necessary action would be

2    appropriate based on the situation.

3    **Q.    So OCA would provide feedback and recommendations**

4    **to a manager of the collection department, for example;**

5    **is that correct?**

6                   ATTORNEY MORRIS:

7                   Objection.  Again, mischaracterization of

8    her testimony.

9    A.   Yeah, it's possible, depending on the issue, that

10   OCA would notify management in a specific business area

11   about an agent issue.  But the way that the CSI

12   database works is when a complaint or escalated inquiry

13   is entered and tracked, and the issues resolved for the

14   customer.  During that research, it's being determined

15   where that employee believes the break may have

16   happened, if a break happened.  And then they in CSI

17   can assign that escalated inquiry or complaint to the

18   business area that they believe a break may have

19   happened.  And then it is electronically moved to that

20   business area to review, and agree that their business

21   area accepts the complaint.  And needs to take an

22   action, feedback or training.  Or they can disagree and

23   say that the customer didn't send the right form, or

24   whatever the case may be.

25   BY ATTORNEY ALVAREZ:

1   Q.   Okay.

2   A.   So there's, it's not just an e-mail from OCA.   The

3   database is built that way as a feedback tool almost,

4   yes.

5   Q.   Okay.  The ultimate discipline, should they decide

6   to discipline an individual agent, let's say on a

7   collection call, that would come from the collection

8   agent's manager or supervisor?  The manager of the

9   business area?  Is that right?

10  A.   Correct.

11  Q.   Is that right?

12  A.   Correct.

13  Q.   Okay.  And that would include call centers that

14  are overseas?

15  A.   Correct.

16  Q.   And the manager for the call centers that are

17  overseas, are they also, are they located overseas with

18  the agents that are placed on the calls?

19  A.   I'm not positive.  I'm not sure.

20            ATTORNEY ALVAREZ:

21            Okay.  Madam Court Reporter, can we play

22  NSI78, that's been marked Exhibit 2 one more time for

23  the witness?

24  AUDIO RECORDING PLAYED

25            JAMEEL:

1          Hello, Melonie?  Melonie Bratcher?

2          MS. BRATCHER:

3          Yes.

4          JAMEEL:

5          Hi, this is Jameel from Navient.

6          MS. BRATCHER:

7          Yes, I asked you guys not to call me

8     anymore.  I'm getting an attorney and I'm going to sue

9     you guys now.  Have a good day.  Don't call me again.

10    AUDIO RECORDING STOPPED

11    BY ATTORNEY ALVAREZ:

12    **Q.   Ms. Kamionka, if the collection agent who placed**

13    **that call and heard Ms. Bratcher complaints and**

14    **statements and repeated request did not document her**

15    **account accordingly, then the manager at OCA would have**

16    **never known that Ms. Bratcher was complaining; correct?**

17          ATTORNEY MORRIS:

18          Object to form.

19    A.   Again, through quality control or other business

20    measures they have, other controls they have in place

21    may have identified the issue.  I couldn't speak to it

22    for sure.

23    BY ATTORNEY ALVAREZ:

24    **Q.   Have there been problems within Navient Solutions**

25    **where complaints such as Ms. Bratcher's have gone**

1    unnoticed?

2                    ATTORNEY MORRIS:

3                    Object to form.

4    A.    Not that I'm aware of.  Not that I could speak to.

5    BY ATTORNEY ALVAREZ:

6    Q.    So in your 28 years of experience at Navient

7    Solutions in various roles, there's never been an issue

8    with Navient ignoring or not effectively documenting

9    requests for calls to stop or complaints about calls

10   continuing when they'd asked for calls to stop.  Is

11   that what you're saying?

12                   ATTORNEY MORRIS:

13                   Object to form.

14   A.    I'm not aware of any, I forget the word you used.

15   But I mean, there's always coaching opportunity or

16   training opportunity for an agent here or there.  But,

17   you know, I'm not aware of any lack in taking action

18   when a customer submits a request.

19   BY ATTORNEY ALVAREZ:

20   Q.    Right.  But you would agree that it would be a

21   problem?  It's a problem when collection agents are

22   ignoring complaints like those of Ms. Bratcher in that

23   recording you just listened to; correct?

24                   ATTORNEY MORRIS:

25                   Object to form.

1  A.   No.   I don't know.   I don't know what happened on

2  this account.   So I couldn't --- I couldn't agree with

3  that statement.

4  BY ATTORNEY ALVAREZ:

5  **Q.   Okay.   What would take place on her account that**

6  **would make it okay for Navient to ignore her request**

7  **for the calls to stop?**

8              ATTORNEY MORRIS:

9              Object to form.   Again, asking her to

10  speculate.

11  A.   Again, I don't know what happened on her account.

12  I don't know if that is what occurred.

13  BY ATTORNEY ALVAREZ:

14  **Q.   I'm sorry, can you clarify?   What do you mean that**

15  **you don't know that this is what occurred?**

16  A.   I don't know without looking at the account

17  exactly what took place.   I heard the phone call.   But

18  I couldn't substantiate anything without doing a

19  review.

20  **Q.   No, I understand that.   But based on the recorded**

21  **conversation that you listened to, and the complaints**

22  **and requests by Ms. Bratcher in those calls, if any**

23  **customer, including Ms. Bratcher, made those types of**

24  **complaints, and the collection agent did not document**

25  **those complaints on the account, or escalate those**

1    **complaints, is that a problem?**

2             ATTORNEY MORRIS:

3             Object to form.

4    A.   Yes, I would think the agent needed additional

5    training or coaching, or it should be documented.

6    BY ATTORNEY ALVAREZ:

7    **Q.   And the calls should have stopped; correct?**

8             ATTORNEY MORRIS:

9             Object to form.

10   A.   Yeah.  I couldn't --- I wouldn't --- I can't speak

11   to their process.  But if the customer was asking for

12   calls to stop and you're referring to TCPA, then yes.

13   BY ATTORNEY ALVAREZ:

14   **Q.   And if you, similar to Ms. Bratcher, had made**

15   **those requests and comments toward Navient Solutions**

16   **and you continue to be called every day, would that be**

17   **harassment?**

18            ATTORNEY MORRIS:

19            Object to form.  And she's not a lawyer,

20   Stefan.  You know, you can answer based on your

21   knowledge, Angela.  But, you know, she's not a lawyer.

22   And that's a legal conclusion.

23            ATTORNEY ALVAREZ:

24            I'm not really a conclusion.  I'm just

25   asking for her based on her experience and also based

1    on her opinion.

2              ATTORNEY MORRIS:

3              Same objection.

4    A.   Based on my opinion and my work experience, I

5    don't think I would classify it as harassing.  I think

6    I would try to get in touch with the appropriate person

7    at whoever that company is to understand what was

8    happening.

9    BY ATTORNEY ALVAREZ:

10   Q.   Okay.  But if you made those requests that you

11   heard on the two recordings, you would expect the calls

12   to stop; correct?

13             ATTORNEY MORRIS:

14             Object to form.

15   A.   Yeah, I'm not really sure what you're asking me.

16   Just my opinion?

17   BY ATTORNEY ALVAREZ:

18   Q.   Yes.

19   A.   If it happened to me?

20   Q.   Yes.

21   A.   I think any request that I would make of a

22   business I would expect to be processed.

23   Q.   And accurately documented; correct?

24   A.   Yes.

25             ATTORNEY ALVAREZ:

```
 1              Give me one second.  We can actually go
 2  off the record and take a quick two-minute break, if
 3  that's okay with everyone.
 4              ATTORNEY VAN HOOSE:
 5              You guys need to feed the meter or
 6  anything like that?
 7              ATTORNEY SHELDON:
 8              No, we're good.
 9              VIDEOGRAPHER:
10              We're off the record at 1:25.
11  OFF VIDEO
12  SHORT BREAK TAKEN
13  ON VIDEO
14              VIDEOGRAPHER:
15              We are back on the record at 1:28.  Please
16  proceed.
17              ATTORNEY ALVAREZ:
18              Thank you again, Ms. Kamionka.  I have no
19  further questions.
20              VIDEOGRAPHER:
21              All right.  Are there any further
22  questions?
23              ATTORNEY MORRIS:
24              Can we actually take a quick break?  Go
25  off the record really quick?
```

```
1                    ATTORNEY ALVAREZ:

2                    Sure.

3                    VIDEOGRAPHER:

4                    We are off the record at 1:28.

5    OFF VIDEO

6    SHORT BREAK TAKEN

7    ON VIDEO

8                    VIDEOGRAPHER:

9                    We're back on the record at 1:33.  Please

10   proceed.

11                   ATTORNEY MORRIS:

12                   Okay.  We're back on the record.  This is

13   Rachel Morris for Navient Solutions.  I have no further

14   questions for the witness.

15                   VIDEOGRAPHER:

16                   No further questions at all?

17                   ATTORNEY MORRIS:

18                   No questions.

19                   VIDEOGRAPHER:

20                   We are going off the record at 1:33.  This

21   concludes disc two and the deposition.

22   OFF VIDEO

23                   ATTORNEY ALVAREZ:

24                   All I need is a copy.

25                   COURT REPORTER:
```

1              Can you give me your e-mail, please?

2              ATTORNEY ALVAREZ:

3              I'm sorry?

4              COURT REPORTER:

5              Can you give me your e-mail address,

6    please.

7              ATTORNEY ALVAREZ:

8              Sure.  It's Stefan, S-T-E, F, as in Frank,

9    A-N, at theconsumerprotectionfirm.com.

10             VIDEOGRAPHER:

11             And you folks, on the other end of the

12   line there are going to give your ---.

13             ATTORNEY MORRIS:

14             RMorris, R-M-O-R-R-I-S, at Sessions,

15   S-E-S-S-I-O-N-S, dot legal.

16             COURT REPORTER:

17             And you wanted e-tran only, ma'am?

18             ATTORNEY MORRIS:

19             I'm sorry?

20             COURT REPORTER:

21             You wanted e-tran only as well, ma'am?

22             ATTORNEY MORRIS:

23             That's fine.

24             * * * * * * * *

25        VIDEOTAPED DEPOSITION CONCLUDED AT 1:33 P.M.

94

1  COMMONWEALTH OF PENNSYLVANIA)

2  COUNTY OF MIFFLIN            )

3                     CERTIFICATE

4       I, Lindsey Deann Richardson, a Notary Public in

5  and for the Commonwealth of Pennsylvania, do hereby

6  certify:

7       That the witness whose testimony appears in the

8  foregoing deposition, was duly sworn by me on said date

9  and that the transcribed deposition of said witness is

10  a true record of the testimony given by said witness;

11       That the proceeding is herein recorded fully and

12  accurately;

13       That I am neither attorney nor counsel for, nor

14  related to any of the parties to the action in which

15  these depositions were taken, and further that I am not

16  a relative of any attorney or counsel employed by the

17  parties hereto, or financially interested in this

18  action.

19

20

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
LINDSEY DEANN RICHARDSON
Notary Public
LEWISTOWN BORO, MIFFLIN COUNTY
My Commission Expires Nov 4, 2017

                              Lindsey Deann Richardson,
                                   Court Reporter

24

25